UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –X

SHAMEL CAPERS,

                              Plaintiff,

                    v.                                    Case No. 24-CV-1219

THE CITY OF NEW YORK, DANIEL               **COMPLAINT**
GALLAGHER, ANTHONY FARANDA,
PETER GALASSO and JOHN/JANE DOES            JURY TRIAL DEMANDED
NUMBERED 1-25,

                              Defendants.

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –X

PLAINTIFF SHAMEL CAPERS, by and through his attorneys, the Shanies Law Office

LLC, Shihata & Geddes LLP, and Debevoise & Plimpton LLP, as and for his Complaint against

Defendant the City of New York (the "City") and individual Defendants Daniel Gallagher,

Anthony Faranda, Peter Galasso, and John/Jane Does Numbered 1-25 (collectively, "Individual

Defendants"), alleges, on knowledge as to his own actions, and otherwise upon information and

belief, as follows:

**OVERVIEW**

1.      On Saturday, May 18, 2013, at approximately 8:50 p.m., D'Aja "Asia" Robinson,

just 14 years old, was killed when a bullet shattered the window of a New York City bus and

struck her in the head.

2.      In the hours and days after the murder, several eyewitnesses identified Kevin

McClinton, then a 21-year-old member of the street gang known as Young Bosses (or "YB") as

the shooter.  Others described the shooter as an individual wearing a bandana covering his face

and an "I Love NY" T-Shirt and with his hair in dreadlocks, a description that matched Mr.

McClinton at the time of the murder.

3.     On June 3, 2013, Mr. McClinton was arrested in Cayce, South Carolina, the town to which he fled following the murder.

4.     Upon his arrest, Mr. McClinton self-servingly and unconvincingly attempted to shift the blame to Mr. Capers.  In recorded jail calls, Mr. McClinton attempted to and did enlist other gang members to help carry out his plan.

5.     On July 30, 2014, the New York City Police Department (the "NYPD") arrested Mr. Capers for the murder of Ms. Robinson—a crime of which Mr. Capers was innocent.  A judgment of conviction was entered against Mr. Capers on July 19, 2017, after he was wrongfully convicted of murder in the second degree following a jury trial.

6.     Mr. Capers was the father of a young daughter and only 16 years old when he was arrested for the murder of Ms. Robinson.  He spent more than 8 years, during the formative years of his life, locked in prison for a crime he did not commit.  The damage done to Mr. Capers and his family was immense and irreversible.

7.     Mr. Capers was exonerated in November 2022 after his attorneys, working cooperatively with the Queens County District Attorney's Office's (the "QCDAO") Conviction Integrity Unit (the "CIU"), completed a comprehensive reinvestigation that conclusively demonstrated Mr. Capers was wrongfully convicted.

8.     Following the reinvestigation, Mr. Capers and Queens County District Attorney (the "District Attorney" or the "DA") Melinda Katz filed a joint motion under Section 440.10 of the New York Criminal Procedure Law ("CPL") to vacate the judgment of conviction (the "Joint 440 Motion") on the grounds of newly discovered evidence pursuant to CPL Section 440.10(1)(g).

9.      During the November 17, 2022 hearing on the Joint 440 Motion, the Director of the CIU for the QCDAO pronounced: "There is newly discovered evidence in this case that demonstrate[s] that Kevin McClinton, [who] was convicted of the murder and currently serving a sentence of 25 [years] to life, is *solely* responsible for this terrible crime."

10.     But much of the evidence that showed Kevin McClinton was the sole shooter was not, in fact, new to Individual Defendants and/or QCDAO prosecutors, who, within their employment with the NYPD or QCDAO, investigated Ms. Robinson's murder and prosecuted Mr. Capers.

11.     These detectives and prosecutors, however, failed to disclose exculpatory evidence to Mr. Capers or his defense attorneys.  In some instances, detectives failed to disclose exculpatory evidence even to prosecutors.

12.     Despite the overwhelming evidence that just one person—Mr. McClinton— murdered Ms. Robinson, Individual Defendants recklessly credited Mr. McClinton's account and myopically pursued Mr. Capers.  To wrongfully convict him, Individual Defendants and/or QCDAO prosecutors, among other things: (a) fabricated a claim that, within two days of the murder, investigators received a report of two shooters; (b) fabricated a claim that Mr. Capers fled to South Carolina along with Mr. McClinton; (c) coerced a witness to fabricate a claim that he saw Mr. Capers shoot Ms. Robinson; and (d) concealed *Brady* information showing that Mr. McClinton was the sole shooter and that Mr. McClinton enlisted others to falsely shift blame from himself to Mr. Capers.[1]

---

1.  All references in this complaint to *Brady* and/or exculpatory information refer to the government's obligation under the Due Process Clauses of the Fifth and Fourteenth Amendments to disclose favorable information to a criminal defendant, and corresponding protections under the New York State Constitution.  *See, e.g.*, *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006); *Kyles v. Whitley*, 514 U.S. 419, 438 (1995); *United States v. Agurs*, 427 U.S. 97, 103-07 (1976); *Giglio v. United States*, 405 U.S. 150, 155 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Wilde v. Wyoming*, 80 S. Ct. 900, 901 (1960); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Alcorta v. Texas*, 335 U.S. 28, 31 (1957); *Berger v. United States*, 295 U.S. 78, 88

13.     The QCDAO's misconduct in this case was part of a long-standing pattern of committing, condoning, and concealing official misconduct, including *Brady* violations.  As one Queens Supreme Court Justice observed during a hearing exonerating three other wrongfully convicted men, behavior of prosecutors and police officers in Queens "leaves the distinct impression that the suppression of the [exonerating] information was not an isolated instance of misconduct, but part of a larger pattern of behavior that was calculated to deprive the defendants of fair trials." *People v. Bell*, 71 Misc. 3d 646, 665 (N.Y. Sup. Ct. 2021).

14.     Through this lawsuit, Mr. Capers now seeks redress for the official misconduct that caused him to spend nearly 8.5 years in prison and the mental and physical injuries he sustained while incarcerated, as a result of his false and unlawfully procured conviction.

## NATURE OF THE ACTION

15.     This is an action to recover compensatory and punitive damages and an award of costs and attorneys' fees for violations of Mr. Capers's rights secured by 42 U.S.C. §§ 1983 and 1988 and by the United States Constitution, including its Fourth, Fifth, and Fourteenth Amendments, as well as New York State law, because of Defendants' suppression of information that was material to the determination of Mr. Capers's innocence or guilt and fabrication of evidence to prosecute and convict Mr. Capers for a crime he did not commit. Specifically, Individual Defendants caused the presentation of false evidence, including false testimony, and knowingly suppressed exculpatory information.

16.     This lawsuit also seeks to hold Defendant the City of New York liable for prosecutorial misconduct under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

---

(1935); *Poventud v. City of New York*, 750 F.3d 121, 133-36 (2d Cir. 2014); *United States ex rel. Meers v. Wilkins*, 326 F.2d 135, 137 (2d Cir. 1964); *United States v. Consol. Laundries Corp.*, 291 F.2d 563, 570-71 (2d Cir. 1961); *United States v. Zborowski*, 271 F.2d 661, 668 (2d Cir. 1959).

The City, through the QCDAO, maintained unlawful policies, customs and practices during Mr. Capers's investigation, arrest and trial.  In executing these unlawful policies, customs, and practices, the City violated the constitutional rights of criminal suspects and defendants.  In Mr. Capers's case, the unlawful policies, customs, and practices enabled Individual Defendants, as well as other members, servants, employees, and agents of the City, to violate Mr. Capers's constitutional rights.  The policymaking officials acting on behalf of the City of New York were deliberately indifferent to these unlawful policies, customs, and practices.  The City is likewise liable under the doctrine of *respondeat superior* for the tortious conduct of its agents and violations of the New York State Constitution.  As a result, all Defendants are jointly and severally liable for Mr. Capers's injuries.

## JURISDICTION

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, in that this is a civil action arising under 42 U.S.C. §§ 1983 and 1988, and pursuant to 28 U.S.C. § 1367 and the principles of pendent jurisdiction as to the claims arising under the common law of the State of New York.

18.     On February 14, 2023, Mr. Capers served the Comptroller of the City of New York timely notice of the present claims, in accordance with Sections 50-e and 50-i of the New York General Municipal Law.  More than 30 days have passed since said service, without these claims having been settled or otherwise resolved.

19.     On June 21, 2023, a hearing was conducted, in accordance with Section 50-h of the New York General Municipal Law.

20.     Mr. Capers has duly complied with all conditions precedent to the commencement of this action.

## VENUE

21.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

22.     Plaintiff Shamel Capers is a citizen of the United States and was, prior to his incarceration, a resident of Queens County in the City and State of New York.

23.     Defendant the City of New York is a municipality that is a political subdivision of the State of New York.  It was at all relevant times the employer of Individual Defendants Daniel Gallagher, Anthony Faranda, Peter Galasso, and John/Jane Does Numbered 1-25, and legally responsible for torts they committed within the scope of their employment or under color of law. The City is also obligated under law and by contract to indemnify and defend Individual Defendants named herein.

24.     Defendant the City of New York is and was at all relevant times responsible for the policies, practices, and customs of the QCDAO.  The City, by its agents, servants, and employees, was responsible for the operation, maintenance, and control of the QCDAO, and for the selection, training, supervision, and discipline of prosecutors.

25.     Defendant Daniel Gallagher, at all times relevant to this Complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.  Defendant Gallagher was working as a detective assigned to the 113th Precinct in Jamaica, New York, when he was assigned to a case involving the murder of D'Aja "Asia" Robinson.  At all times stated herein, Defendant Gallagher was acting within the scope of his employment.  This lawsuit seeks to hold Defendant Gallagher liable in his individual capacity.

26.     Defendant Anthony Faranda, at all times relevant to this Complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.  Defendant Faranda was working as a detective assigned to the 113th Precinct in Jamaica, New York, when he was assigned to a case involving the murder of D'Aja "Asia" Robinson.  At all times stated herein, Defendant Faranda was acting within the scope of his employment.  This lawsuit seeks to hold Defendant Faranda liable in his individual capacity.

27.     Defendant Peter Galasso, at all times relevant to this Complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.  Defendant Galasso was working as a detective assigned to the 113th Precinct in Jamaica, New York, when he was assigned to a case involving the murder of D'Aja "Asia" Robinson.  At all times stated herein, Defendant Galasso was acting within the scope of his employment.  This lawsuit seeks to hold Defendant Galasso liable in his individual capacity.

28.     Defendants John/Jane Does Numbered 1-25 are employees of the NYPD who acted toward Mr. Capers under color of law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York; and who participated in the misconduct alleged herein; but whose actual names Mr. Capers has been unable to ascertain notwithstanding reasonable efforts to do so.  This lawsuit seeks to hold Defendants John/Jane Does 1-25 liable in their individual capacities.

## BACKGROUND

I.    **The Crime and Police Investigation**

29.    On Saturday, May 18, 2013, at approximately 8:50 p.m., D'Aja "Asia" Robinson, just 14 years old, was killed when a bullet shattered the window of a New York City bus and struck her in the head.  When she was killed, Ms. Robinson was completing her freshman year in high school, and had just left a Sweet Sixteen party nearby.

30.    On or about May 19, 2013, then-NYPD Commissioner Raymond Kelly publicly announced, "The events are being aggressively investigated—certainly the possibility of some gang involvement here."  He continued, "One thing is clear: She was, in our judgment, not the target of the shooting."

31.    In light of Ms. Robinson's young age, bright future, and status as an innocent bystander, the community expressed its collective horror at her murder and the NYPD and QCDAO were under immense pressure to bring someone to justice for her murder.

32.    Ms. Robinson's murder was extensively covered in the print and broadcast media, both locally and nationally.

33.    The NYPD—led by the Queens Homicide Division—launched a high-priority investigation.

34.    Then-District Attorney Richard Brown met with Ms. Robinson's family and, according to one witness, personally attended one or more witness interviews during the investigation, further evidencing the extraordinary pressure facing the QCDAO.

35.    The NYPD "Crime Stoppers" program offered thousands of dollars in rewards, and the NYPD received numerous tips through the program.

36.     The NYPD interviewed dozens of witnesses, including many people who were with Ms. Robinson earlier in the day and when she was killed.

37.     Several of those interviewed reported that they had attended one or both of two events on the day of Ms. Robinson's murder: the annual "Freaky Tah" celebration in Rochdale Park in Queens, and a Sweet Sixteen party at Onyx Lounge located at 152-34 Rockaway Boulevard in Queens.

38.     The Freaky Tah celebration on May 18, 2013, took place in Rochdale Park in Queens in memory of Freaky Tah, a Queens-based rapper who was murdered in 1999.  At the celebration, hundreds of community members gathered in the afternoon and stayed until the evening.  Among the individuals at the Freaky Tah celebration were Shamel Capers, Kevin McClinton, Raquan Bryant, and Lael Jappa.  Rochdale Park is less than a mile from the location where Ms. Robinson was killed.

39.     The Sweet Sixteen party at Onyx Lounge, attended by dozens of guests, began around 3:00 p.m. and lasted several hours.

40.     Around 7:30 p.m., while the Sweet Sixteen party was ongoing, Terrence Payne, also known as "TC," fired a gun into the air in the vicinity of the party.  The Sweet Sixteen party disbanded shortly after the gunfire.

41.     Many of the partygoers, including Ms. Robinson and her friends, left Onyx Lounge and headed to the bus stop near Sutphin Boulevard and Rockaway Boulevard, a few blocks away from the venue, where they planned to take a bus to another party.  Mr. Payne headed toward the same bus stop.

42.    Ms. Robinson and her friends, among others, boarded the Q6 bus.  Sierra "CeCe" Orival headed toward the back of the bus and sat in an aisle seat; Ms. Robinson sat down on her lap.

43.    As Ms. Robinson sat on the bus, Mr. McClinton fired a .40 caliber handgun at least eleven times in the direction of the Q6 bus.  One of the bullets struck Ms. Robinson's head.  Ms. Robinson was taken to Jamaica Hospital Medical Center, where she was pronounced dead.

44.    In response to the shooting, law enforcement canvassed the scene and recovered nine .40 caliber shell casings and several deformed bullets or bullet fragments.  Another bullet was recovered from Ms. Robinson's head.

45.    Ballistics testing showed that all nine .40 caliber casings were discharged from a single firearm and that all the deformed bullets and bullet fragments that were capable of being tested were also discharged from a single weapon.

46.    The investigation revealed that the shooting may have related to a dispute between two street gangs, the SNOW ("Snow") gang and the Wood City gang.

47.    Within a short time, several witnesses identified Mr. McClinton as the shooter.

48.    On June 4, 2013, detectives with the 113th Precinct of the NYPD arrested Mr. McClinton in South Carolina.  On the day of his arrest, Mr. McClinton gave investigators two self-serving and false stories about the murder.  In both stories, Mr. McClinton falsely claimed that Mr. Capers shot Ms. Robinson.[2]

_____

2.  Mr. McClinton's attempt to shift the blame to Mr. Capers was not only completely self-serving, but also an unsurprising choice.  Mr. McClinton was 21 years old when he shot Ms. Robinson, and he knew that the 15-year-old Mr. Capers, who was with him earlier that day, faced far less jail time than Mr. McClinton, on account of his status as a minor.  *Compare* N.Y. Penal Law §§ 70.05(2)(a), 70.05 (3)(a) (maximum penalty for murder by a juvenile offender is a term of imprisonment of 15 years to life), *with* N.Y. Penal Law §§ 70.00(2)(a), 70.00(3)(a)(i) (maximum penalty for murder by an adult is a term of imprisonment of 25 years to life).

49.     On June 4, 2013, Defendant Galasso, Defendant Gallagher, and other members of law enforcement contacted family members of Mr. Capers to locate and interview Mr. Capers. The following day, an attorney for Mr. Capers called the NYPD and informed Defendant Faranda that Mr. Capers would voluntarily appear for a meeting with the NYPD at the 113th Precinct.

50.     On June 11, 2013, Mr. Capers, who was just 15 years old, voluntarily met with NYPD detectives, including Defendants Faranda and Gallagher, and provided the following account of what he saw on the evening of May 18, 2013: Mr. Capers was walking toward the bus stop when he encountered Mr. McClinton and a few others.  Within a short time, he saw Mr. McClinton fire a gun toward the bus.  Mr. Capers ran away from the gunshots, toward home.

51.     During this June 11th meeting, Defendants Faranda and Gallagher coerced Mr. Capers to adopt their false narrative that he both: (a) saw Mr. McClinton, and (b) traveled to South Carolina, soon after the murder.  Defendants Faranda and Gallagher led Mr. Capers to believe—falsely, of course—that he would not get into trouble if he agreed with their account.

52.     On July 9, 2013, Terrence Payne testified before a grand jury that he tried to attend the Sweet Sixteen party at Onyx Lounge on the night Ms. Robinson was killed, but he was turned away because it was overcrowded; in response, Mr. Payne then fired a single shot into the air, leading Onyx Lounge to end the party.  Mr. Payne then headed toward the bus stop at the intersection of Sutphin and Rockaway Boulevards, where he encountered Mr. McClinton. According to Mr. Payne, Mr. McClinton pointed a gun at him and asked him whether he was affiliated with Wood City, and when Mr. Payne answered in the negative, Mr. McClinton said, "We're just gonna do the bus."  Mr. Payne testified that he next saw Mr. McClinton fire his gun in the direction of the bus.

53.     The prosecutor asked Mr. Payne, "Did you see him fire all 10 shots?" and Mr. Payne answered, "Yes."

54.     Mr. Payne then testified that Mr. McClinton "fired five up close then he fired five when he was running away."  Mr. Payne never suggested there was any second shooter and his grand jury testimony affirmatively indicated that there was only one shooter.

55.     The grand jury who heard Mr. Payne's testimony returned an indictment against Mr. McClinton, charging murder in the second degree and related counts, all stemming from Mr. McClinton's murder of Ms. Robinson on May 18, 2013.

56.     On April 1, 2014, after the grand jury indicted Mr. McClinton, Lael Jappa was arrested, charged with felonies, and incarcerated.  Following his arrest and incarceration, Mr. Jappa met with prosecutors from the QCDAO, agreed to cooperate with law enforcement, and ultimately entered into a cooperation agreement with the QCDAO in exchange for significant leniency at his sentencing.

57.     Other than two very short reports prepared by Defendant Gallagher and Detective Joseph Garofalo documenting that Mr. Jappa identified a photograph of Mr. Capers as Mr. Capers and a photograph of Mr. McClinton as Mr. McClinton, whom Mr. Jappa said he had known for over six months, there are no notes or reports that document what Mr. Jappa said about Ms. Robinson's murder or any other topic during his meetings with the NYPD and QCDAO.

58.     Following Mr. Jappa's cooperation, on July 21, 2014, the NYPD reopened its investigation of Ms. Robinson's murder and shortly thereafter sought Mr. Capers's arrest for his purported role in Ms. Robinson's murder.  Mr. Capers voluntarily surrendered to authorities on July 30, 2014, and was incarcerated.

59. Almost a year later, during which time Mr. Capers remained incarcerated, the QCDAO presented evidence to a grand jury in support of an indictment against Mr. Capers for the murder of Ms. Robinson.

60. Based on information and belief, Mr. Jappa was the only witness presented to the grand jury who implicated Mr. Capers in shooting Ms. Robinson.[3]

61. The prosecution did not call Mr. Payne, who had previously testified unequivocally that Mr. McClinton was the sole shooter, as a witness before this grand jury. Nor did the prosecution introduce to this grand jury any other evidence concerning Mr. Payne's prior testimony.

62. On May 13, 2015, Mr. Jappa testified before the grand jury that he encountered Mr. McClinton at the Freaky Tah celebration on the day of Ms. Robinson's murder, that Mr. McClinton introduced Mr. Capers as "Mel Da Boss" and as his "drop," and that Mr. Jappa "knew" Mr. Capers was "gripped"—*i.e.*, carrying a firearm.[4] Mr. Jappa testified that at some point, someone received a telephone call and several people, including Mr. McClinton and Mr. Capers, left Rochdale Park. Mr. Jappa left shortly thereafter, and went to Onyx Lounge and then

---

3. Another witness, Lashea Boutknight, testified that she saw Mr. McClinton and Mr. Capers before the shooting and that same night, after the shooting, she saw Mr. McClinton discard clothing. Specifically, in the grand jury, the QCDAO prosecutor asked whether Ms. Boutknight saw Mr. McClinton at the Freaky Tah celebration in Rochdale Park, whether she saw Mr. Capers at the Freaky Tah celebration in Rochdale Park, and whether she saw them "together" there, and she answered in the affirmative to each of those questions. The QCDAO prosecutor also asked whether, after the Sweet Sixteen party disbanded, she saw Mr. McClinton, whether she also saw Mr. Capers there, and whether they were "together," and Ms. Boutknight again answered, "yes" to each of those questions. Ms. Boutknight also testified she recognized other individuals, whom she identified as being affiliated with the Snow gang, across the street from Onyx Lounge along with Mr. McClinton and Mr. Capers. Finally, Ms. Boutknight testified that later that evening, after the shooting of Ms. Robinson, she saw Mr. McClinton discarding clothing in a dumpster at Rochdale Park. The QCDAO prosecutor did not ask whether Mr. Capers was present at Rochdale Park, but the context of the questioning suggested that Ms. Boutknight would have answered that she did not see Mr. Capers at that time.

4. At the direction of the QCDAO prosecutor, Mr. Jappa did not say how he "knew" Mr. Capers was carrying a firearm that day. However, based on the manner in which the prosecutor instructed Mr. Jappa—"Don't say what anybody said to you"—it appears that Mr. Jappa based his belief on hearsay and did not see Mr. Capers with a gun.

to the bus stop at Rockaway and Sutphin Boulevards.  There, Mr. Jappa testified, he saw Ms. Robinson and her friends boarding the bus, and he heard someone—though he could not identify *who*—say, "Blow that," and that the shooting then began.  Mr. Jappa then falsely testified that he "saw" Mr. Capers shoot a gun in the direction of the bus, Mr. McClinton then took the gun from Mr. Capers, and Mr. Jappa "saw" Mr. McClinton then shoot toward the bus.

63.     On May 21, 2015, the grand jury returned an indictment charging Mr. Capers with murder and related crimes.

64.     In May 2015 and August 2015, Raquan Bryant met with prosecutors from the QCDAO.  Like Mr. Jappa, Mr. Bryant was facing multiple felony charges, and he agreed to cooperate with law enforcement and entered into a cooperation agreement with the QCDAO in exchange for significant leniency at his sentencing.  There are no notes or reports documenting what transpired at any of Mr. Bryant's meetings with the NYPD and QCDAO.[5]

65.     Mr. McClinton and Mr. Capers were tried separately.  On May 9, 2016, a jury returned guilty verdicts against Mr. McClinton for one count of murder in the second degree and two counts of criminal possession of a weapon in the second degree, all stemming from Mr. McClinton's role in killing Ms. Robinson on May 18, 2013.  On September 14, 2016, Mr. McClinton was sentenced to 40 years to life imprisonment on those counts.  Mr. McClinton is currently serving his term of imprisonment.

---

5.   The only substantive report regarding Mr. Bryant that was memorialized by the QCDAO or NYPD was on June 21, 2013, when Mr. Bryant met with NYPD detectives in Queens after his arrest for graffiti.  When shown a photo of Mr. Capers, Mr. Bryant identified Mr. Capers and described him as Mr. McClinton's "drop," *i.e.*, a term understood to mean someone Mr. McClinton had taken under his wing.  Mr. Bryant also provided a handwritten statement to the NYPD, in which he wrote that after Ms. Robinson's murder, Mr. McClinton and Mr. Capers returned to Rochdale Park that evening and Mr. McClinton claimed to Mr. Bryant that "his drop started shooting at the bus . . . and then [Mr. McClinton] snatched the gun out of his hands and then he started shooting."  Mr. Bryant wrote that Mr. McClinton told him that he was "shooting at some girl named CeCe because she was taunt[ing] him and disrespecting him."  Mr. Bryant was released from custody the next day.

## II.    The Trial of Shamel Capers

66.    Mr. Capers's trial began on June 5, 2016, with jury selection and opening statements following on June 9, 2016.  At trial, the QCDAO called 16 witnesses and entered dozens of exhibits into evidence, but the only evidence that related to Mr. Capers was: (a) the hearsay testimony of Defendant Galasso that within a day of the murder, the investigation revealed that there were two shooters; (b) video surveillance and still photographs from the video surveillance showing Mr. McClinton, Mr. Capers, and several other people in the vicinity of Onyx Lounge shortly before the shooting; (c) the testimonies of cooperating witnesses Mr. Jappa and Mr. Bryant, both of whom received significant benefits from the prosecution in exchange for their testimonies; and (d) hearsay testimony that Mr. Capers fled to South Carolina after Ms. Robinson's murder.  No physical or forensic evidence linked Mr. Capers to the crime.

### A.    Defendant Peter Galasso Fabricated Evidence

67.    Before and during the trial, Defendant Galasso falsely claimed that investigators received information, within one day of Ms. Robinson's murder, indicating the existence of not one, but *two*, shooters at the Q6 bus.  Defendant Galasso testified at trial that by May 19, 2023, investigators had identified *one* of those suspected shooters as Kevin McClinton.  He further testified that investigators did not identify Mr. Capers as the suspected *second* shooter until the first week of June 2013.

68.    To the contrary, the NYPD never received information suggesting the existence of a second shooter until *weeks after* the murder, when Mr. McClinton, under arrest, self-servingly identified Mr. Capers as the shooter.

**B.    The Video Footage of the Actual Shooter Moments Before the Shooting**

69.    At Mr. Capers's trial, the QCDAO introduced video footage recorded by cameras in the vicinity of Onyx Lounge minutes before the shooting.  The footage showed numerous people, including Mr. McClinton and Mr. Capers.

70.    The video shows Mr. McClinton shortly before the shooting, wearing a bandana over his face and an "I Love NY" T-shirt, and apparently clutching something at his side with his left hand.  Significantly, Mr. McClinton's appearance in the video was an exact match to descriptions of the shooter provided by multiple eyewitnesses in the immediate aftermath of the murder.

71.    During the QCDAO prosecutor's summation at Mr. Capers's trial, the prosecutor conceded that this video showed Mr. McClinton holding a gun just minutes before the shooting.

**C.    Fabricated Testimony of Cooperating Witness Lael Jappa**

72.    On July 16, 2017, the QCDAO called Mr. Jappa as a witness at Mr. Capers's trial.[6]  Mr. Jappa was the only witness who testified that he saw Mr. Capers play any role in the murder.

73.    As described herein, Mr. Jappa later recanted his testimony, and his recantation was uniquely corroborated by telephone calls in which he characterized the information he provided as "lies."  Notably, the timing of the calls corresponded to his meetings with the QCDAO.

74.    At Mr. Capers's trial, Mr. Jappa testified that he received significant benefits in exchange for his testimony.  He described how he started to cooperate with law enforcement

---

6.    Among the reasons Mr. Jappa came to the attention of the NYPD and QCDAO was that he dropped a cell phone at the location where Ms. Robinson was murdered and the NYPD recovered it and traced it to Mr. Jappa.

only after his arrest and incarceration in April 2014. He explained that if he did not cooperate

with the QCDAO, he understood that he could plead guilty and face a sentence of seven years,

but that if instead he cooperated and pleaded guilty, he would face a sentence of only two years,

which he then agreed to do. At the time of his testimony at Mr. Capers's trial, Mr. Jappa had not

yet been sentenced, but had already been released from custody.

75.     Mr. Jappa testified that he was affiliated with the Snow gang and the Young

Bosses, otherwise known as "YB," a street gang affiliated with the Snow gang, and that he

understood that Sierra Orival, also known as "CeCe," was affiliated with Wood City, a rival

street gang.

76.     Mr. Jappa told the jury that on the afternoon of May 18, 2013, he encountered Mr.

McClinton and Mr. Capers at the Freaky Tah celebration in Rochdale Park, that Mr. Capers

identified himself as "Mel Da Boss"—which Mr. Jappa understood to indicate that he was

affiliated with the YB street gang—and that Mr. McClinton introduced Mr. Capers as Mr.

McClinton's "drop,"—which Mr. Jappa understood to indicate an individual whom Mr.

McClinton brought into the gang.

77.     Mr. Jappa testified that he was carrying a .22 caliber handgun at Rochdale Park.

The QCDAO prosecutor tried to elicit testimony that Mr. Capers was also carrying a gun, but

Mr. Jappa testified only that Mr. Capers was acting suspicious and touching his (Mr. Capers's)

pocket, and further testified that he (Mr. Jappa) did not know if anyone other than himself was

armed.

78.     Mr. Jappa testified that after receiving a telephone call, a group of people that

included Mr. McClinton and Mr. Capers left Rochdale Park and headed to Onyx Lounge. Mr.

Jappa followed a few minutes later, but then learned that the party at Onyx Lounge ended after a

shooting, so he went to the bus stop at Rockaway and Sutphin Boulevards.  Mr. Jappa planned to get on the bus and go to another party.

79.     Mr. Jappa testified that when he arrived at the bus stop, he saw Ms. Robinson and Ms. Orival, among others, boarding the bus.  But as he was approaching the bus door, he heard someone say, "Blow that," which he understood meant that someone was about to start shooting. In response, Mr. Jappa reached into his pocket, grabbed his own gun and cocked it; he then heard gunshots.  Mr. Jappa tried to return fire, but his gun jammed.

80.     Mr. Jappa testified falsely that after he heard approximately three gunshots, he saw Mr. Capers point a firearm toward the back of the bus, saw Mr. McClinton "snatch[]" the firearm from Mr. Capers, and then heard five or six more gunshots.  Mr. Jappa testified that after he saw Mr. McClinton supposedly snatch the firearm from Mr. Capers, Mr. Jappa started to run, breaking down his .22 caliber gun and dropping one bullet in the nearby Baisley Pond Park.

### D.    Fabricated Testimony of Cooperating Witness Raquan Bryant

81.     On July 19, 2017, the QCDAO called Mr. Bryant as a witness at Mr. Capers's trial.  While the QCDAO placed great emphasis on Mr. Bryant's testimony, as described below, Mr. Bryant did not claim to have witnessed the murder.  Mr. Bryant's only reasons for linking Mr. Capers to Ms. Robinson's murder were Mr. McClinton's self-serving, blame-shifting statements.

82.     Mr. Bryant testified that he started to cooperate with law enforcement after he faced robbery and conspiracy charges related to *three* separate incidents.  He further testified that he understood the QCDAO had offered that he could plead guilty and receive a sentence of 12 years to resolve those three matters, or, alternatively, that he could plead guilty, testify in any

proceedings against Mr. McClinton and Mr. Capers in connection with the murder of Ms.

Robinson, and receive a sentence of only 3.5 years, which he then agreed to do.

83.     Mr. Bryant testified that on the day of Ms. Robinson's murder, Mr. Bryant

encountered Mr. McClinton and Mr. Capers at the Freaky Tah celebration in Rochdale Park,

where Mr. McClinton introduced Mr. Capers as "Mel Da Boss" and referred to Mr. Capers as his

"drop." Mr. Bryant testified that Mr. McClinton told him (Mr. Bryant) that Mr. Capers had a

"Stacy"—understood to mean a gun—and that the three of them walked a few blocks away,

where Mr. Capers showed Mr. Bryant that he was carrying a .40 caliber firearm.

84.     Mr. Bryant testified that at some point in Rochdale Park, someone received a

phone call and learned that "Day Day"—a member of the Snow gang—had run into the Wood

City gang at Onyx Lounge, leading several people, including Mr. McClinton and Mr. Capers, to

leave Rochdale Park.

85.     Mr. Bryant added that later that evening, he again encountered Mr. McClinton

and Mr. Capers and that at that time, Mr. McClinton described to a group of individuals,

including Mr. Bryant, what led to the murder of Ms. Robinson.  Mr. Bryant then claimed that he

heard Mr. McClinton's hearsay account that he saw "Burberry Nick" and "CeCe" [Ms. Orival],

both affiliated with rivals of the Snow gang and the YBs; that CeCe was making a hand sign that

was derogatory to the Snow gang; that Mr. McClinton's "drop"—an apparent reference to Mr.

Capers—started shooting; and that Mr. McClinton took the gun and fired it himself.

**E.     Fabricated Evidence of Flight**

86.     On June 11, 2013, Mr. Capers went to the 113th Precinct where he met with

Defendants Faranda and Gallagher, waived his *Miranda* rights, and made oral and written

statements.  One or both of the Defendants fabricated a claim that Mr. Capers admitted to

traveling to South Carolina days after Ms. Robinson's murder, and coerced Mr. Capers, then just 15 years old, to falsely write that he had traveled to South Carolina in the immediate aftermath of Ms. Robinson's murder.

87.    On June 13, 2017, the QCDAO called Defendant Galasso as a witness.  Defendant Galasso testified that on June 4, 2013, Mr. McClinton was arrested in South Carolina and that following Mr. McClinton's arrest, Defendant Galasso went to a second location in South Carolina in search of Mr. Capers.  Defendant Galasso testified that at that second location, he spoke with Mr. Capers's sister and grandmother, through whom he "confirmed that [Mr. Capers] was down there in South Carolina," although not present at that time.  Neither Defendant Galasso, nor any other law enforcement officer, ever actually saw Mr. Capers in South Carolina.

88.    Contrary to these detectives' false statements, Mr. Capers did not travel to South Carolina between Ms. Robinson's murder on May 18, 2013 and his meeting with the NYPD on June 11, 2013.  Nor did any person tell Defendants that Mr. Capers was present in South Carolina at the time.  Both Defendants fabricated those claims and/or acquiesced to the other's fabrication thereof.

**III.    The Jury's Verdict and the Trial Court's Sentencing**

89.    On June 21, 2017, the jury returned verdicts of guilty on three counts: one count of murder in the second degree and two counts of criminal possession of a weapon in the second degree.

90.    Mr. Capers was sentenced on July 19, 2017.  At the hearing, with the consent of the QCDAO, the sentencing judge set aside the two counts of criminal possession of a weapon, leaving Mr. Capers convicted of a single count of murder in the second degree.  Mr. Capers was then sentenced to 15 years to life imprisonment for the murder.  Because of the high-profile

nature of the crime and over the objection of counsel for Mr. Capers, Mr. Capers's sentencing

was videotaped by CBS News and later broadcast on evening television.

91.     Even today, there are dozens of news articles referencing Mr. Capers's arrest,

conviction, and sentencing, and a video recording of Mr. Capers's sentencing remains available

on the internet.  They will likely remain publicly available forever.

## IV.    The Reinvestigation and Discovery of Suppressed Exculpatory Information

92.     Mr. Capers has always maintained that he did not play any role in shooting at the

Q6 bus on May 18, 2013, and that Mr. McClinton shot and killed Ms. Robinson.

93.     Like Mr. Capers, Mr. Payne also asserted that Mr. McClinton was the lone

shooter at the Q6 bus on May 18, 2013.  The QCDAO, however, did not call Mr. Payne as a

witness at Mr. Capers's trial, and notwithstanding the tremendous exculpatory value of Mr.

Payne's grand jury testimony, the QCDAO never disclosed to Mr. Capers the grand jury

testimony where Mr. Payne testified that Mr. McClinton was the sole shooter.

94.     Mr. Payne is now deceased.

95.     Lawyers for Mr. Capers uncovered evidence of Mr. Capers's innocence, including

that Mr. Jappa and Mr. Bryant recanted portions of their testimony, and after they brought these

facts and others to the attention of the QCDAO CIU in or about April 2020, the CIU agreed to

launch a reinvestigation.

96.     The reinvestigation that followed was extensive and involved a review of

thousands of recorded telephone calls, thousands of pages of documents, and voluminous

electronic data, and interviews of dozens of witnesses.

97.     During the reinvestigation, Mr. Jappa agreed to meet with the CIU.

Acknowledging the possibility of perjury charges, Mr. Jappa candidly admitted that he had

falsely implicated Mr. Capers.  During a recorded meeting, Mr. Jappa told the CIU that he was present for Ms. Robinson's murder and heard the gunshots.  He further told the CIU that he had a gun, which he tried to use, though it jammed.  He insisted that he did not see who shot at the bus and that his testimony at Mr. Capers's trial was false.

98.     Mr. Jappa also told the CIU that after the shooting, he encountered Mr. McClinton—*without* Mr. Capers—and Mr. McClinton asked him which one of the two of them—Mr. Jappa or Mr. McClinton—killed Ms. Robinson. Mr. Jappa understood Mr. McClinton's question as an admission that Mr. McClinton shot in the vicinity of the bus and knew that he and Mr. Jappa were the only possible shooters.

99.     Mr. Jappa explained to the CIU that during his earlier meetings with the QCDAO, one or more of Individual Defendants presented Mr. Jappa with a version of the shooting which they said that they had "heard," making clear that Mr. Jappa needed to reiterate that version to secure a cooperation agreement.  Mr. Jappa told the CIU that he had several conversations with his mother while he was incarcerated at Rikers Island in which he told her his cooperation was based on lies.

100.    The CIU found those recordings.  As he had described to the CIU, Mr. Jappa was recorded telling his mother that the information he gave the QCDAO was "lies" and that "they" wanted him to continue lying.

101.    These calls were recorded and in the QCDAO's possession before and during the trial, but they were not disclosed to Mr. Capers until after the CIU began its reinvestigation, approximately eight years into Mr. Capers's imprisonment.

102.    The CIU also located recorded telephone calls placed by Mr. McClinton in the days after Mr. McClinton's arrest and return to New York, in which Mr. McClinton directed an

associate to tell others that they needed to falsely implicate Mr. Capers as the shooter to

exonerate Mr. McClinton.  The following is a draft transcription of one such call, "KM" referring

to Mr. McClinton and "UM" referring to an unknown male associate of Mr. McClinton:

> KM:  [UI] Get in contact with my mamma.  And tell her, that you want to speak
> to Nate, yourself, personally. Nate or Donovan, my little brothers.  You
> gotta tell them to tell Devo, Lashea and whoever else to give up Shamel
> Capers's name as the one who was shooting through that bus.  They gotta
> give up his name.[7]
>
> UM:  Okay.  They know Shamel did this?
>
> KM:  Yeah, they know who was the one shooting at the bus.  And I don't know
> exactly who was shooting [UI].  So when you talk to them, also say, you
> know, [UI] they probably saying Kev was shooting, that Kev say he was
> shooting in the air, [UI] my brothers and them already know this.
>
> UM:  Um hum.
>
> KM:  That's the main thing, right now.  You gotta get in touch with them real
> quick.  You know, tell 'em not to testify of me being the one [UI].  Which I
> didn't.
>
> UM:  Um, um, what you say?
>
> KM:  You gotta um, you gotta call my mamma, ask for Nate or Don and tell
> them you want to talk to [UI] and tell them to talk to whoever's saying
> that I was the one who shot through the bus and shot that little girl, that it
> wasn't me.  To tell them that Shamel Capers did it.

103.     These telephone calls were recorded, and the recorded calls and notes describing

the contents of the calls were in QCDAO's possession at the time of trial, but they were not

disclosed to Mr. Capers until January 24, 2022.

104.     During the reinvestigation, the CIU also located messages sent over Facebook

between Mr. Bryant and Ms. Orival in the days immediately after Ms. Robinson's murder and

well before Mr. Bryant first made a statement to the NYPD on June 21, 2013.  Significantly, in

---

7.   Devo (Devonte Sconiers) and Lashea (Lashea Bouknight) were also affiliated with the Snow gang.

both the Facebook messages and at Mr. Capers's trial, Mr. Bryant identified Ms. Orival as his "best friend" and expressed affection for her.

105.    In the messages, Ms. Orival made clear her fear that she was the intended target of the shooting that killed Ms. Robinson, her fear that she was going to be shot by members of the Snow gang, and the fact that she had heard that Mr. McClinton had been implicated in the murder.  In response, Mr. Bryant assured Ms. Orival she should not be scared[8] and said he did not know whether Mr. McClinton was involved in the shooting.  Mr. Bryant wrote, "He [Mr. McClinton] my son, but idk [I don't know] if he did it or not[.]"

106.    This statement directly contradicted Mr. Bryant's later testimony that Mr. McClinton purportedly told him on the night of the murder that he and Mr. Capers shot at the bus and were aiming at Ms. Orival.

107.    These messages, which materially undermine Mr. Bryant's trial testimony and could have been used to impeach him, were in the QCDAO's possession before and during the trial, but they were not disclosed to Mr. Capers until February 4, 2022, towards the end of the CIU's reinvestigation.

108.    Interviews of eyewitnesses conducted by the CIU as part of the reinvestigation provide yet more evidence of egregious misconduct by Individual Defendants, including the fabrication of police records and intimidation and threatening of minor witnesses.

109.    Among those eyewitnesses is Individual #1,[9] who was on the Q6 bus when Ms. Robinson was fatally shot.

---

8.  For example, when Ms. Orival told Mr. Bryant that others were saying that she was "next," he responded, "We really didn't do that shit, we was all in Rochdale at freaky Tah day," and assured her that his friends "kno I like you they will nevaa do no shit like that[.]"

9.  Individual #1's identity and account were revealed to Mr. Capers following the CIU reinvestigation.  Her identity is being kept confidential in this Complaint to protect her privacy interests.

110.     According to NYPD records, on May 20, 2013, Defendant Faranda and Detective Frank Dorfman interviewed Individual #1 about the incident.

111.     According to NYPD records, on October 10, 2013, Defendant Gallagher and Assistant District Attorney ("ADA") Patricia Theodorou interviewed Individual #1 about the incident.

112.     When the CIU interviewed Individual #1 as part of the reinvestigation, Individual #1 described the circumstances under which she, then a 12- or 13-year-old girl, was forced to speak with the police.  She described how the police called her repeatedly and came to her school, her home, and "anywhere they could find [her]" to question her.

113.     When the CIU discussed with Individual #1 the NYPD records described above, Individual #1 told the CIU that both reports contained false information that the detectives "fabricated."

114.     Individual #1 described certain information reflected in the reports as "absolutely incorrect," at one point remarking that "it seems like they [the detectives] just had a bunch of bullshit there" and that the detectives "tried to utilize anything we said or twist our words to make it seem like that." The detectives, she added, seemed to be "taking the story and then fabricating it into what they want."

115.     Individual #1 also reported to the CIU that that the above-named detectives used the same tactic they used to coerce false statements from Mr. Capers—rather than ask her what happened, the detectives gave her their own accounts of what happened and then pressured her to adopt those accounts.

116.    All the above facts that the CIU learned through its interview of Individual #1 were withheld by Individual Defendants from the defense.  Mr. Capers only learned of these facts following the CIU's reinvestigation of his case.

117.    Also among the eyewitnesses interviewed by the CIU is Individual #2,[10] who reported to the CIU that she was 13 years old and pregnant at the time of Ms. Robinson's murder.

118.    Individual #2 reported to the CIU that the NYPD detectives investigating Ms. Robinson's murder threatened her that if she did not cooperate, her unborn child would be taken from her and raised in foster care, causing her to be extremely fearful of the detectives.

119.    All the above facts that the CIU learned through its interview of Individual #2 were withheld by Individual Defendants from the defense.  Mr. Capers only learned of these facts following the CIU's reinvestigation of his case.

120.    The identities of all the detectives involved in the misconduct described above will be the subject of discovery in this case, but based on information and belief, they include Defendants Faranda, Galasso, and Gallagher.

121.    In sum: (a) Individual Defendants and/or the QCDAO withheld from Mr. Capers and the jury the exculpatory evidence of Mr. Payne's credible testimony before a grand jury that Mr. McClinton was the lone shooter at the Q6 bus on May 18, 2013; (b) cooperating witness Mr. Bryant received significant benefits from the prosecution in exchange for his false testimony inculpating Mr. Capers—testimony that flowed directly from Mr. McClinton's blame-shifting campaign and, in any event, was undermined by Mr. Bryant's contemporaneous Facebook

---

10. Individual #2's identity and account were revealed to Mr. Capers following the CIU reinvestigation.  Her identity is being kept confidential in this Complaint to protect her privacy interests.

communications that took place before his arrest and decision to cooperate with the QCDAO;

(c) cooperating witness Mr. Jappa likewise received significant benefits from the prosecution in

exchange for his false testimony implicating Mr. Capers—testimony that was wholly unreliable

given Mr. Jappa's subsequent recantation and his telephone calls to his mother in which he

admitted that the information he was providing were lies; (d) the QCDAO withheld from Mr.

Capers and the jury the exculpatory evidence of Mr. Jappa's recorded telephone calls; (e)

Individual Defendants threatened, intimidated, and placed immense pressure on individuals,

many of whom were young teenagers, to repeat false narratives that Individual Defendants hoped

to use to unjustly prosecute and convict Mr. Capers; and (f) Individual Defendants fabricated

evidence by creating falsified police reports about their interviews of eyewitnesses.

122.    As the QCDAO correctly concluded, the evidence showed that it was solely Mr.

McClinton, and not Mr. Capers, who shot at the Q6 bus on May 18, 2013, killing Ms. Robinson.

**V.      Defendant the City of New York's Deliberate Indifference to Police and Prosecutorial Misconduct, and Its Failure to Train, Supervise and Discipline Its Employees**

123.    Mr. Capers's wrongful conviction and imprisonment were not a random

miscarriage of justice in an otherwise functioning law enforcement regime.  Rather, during the

relevant period, policymakers for the QCDAO, acting on behalf of Defendant the City of New

York, engaged in the following misconduct, which was reflected, and led to the wrongful

conviction, in Mr. Capers's case: acted with deliberate indifference to the constitutional rights of

individuals suspected of or charged with criminal activity; and implemented or tolerated plainly

inadequate policies, procedures, regulations, practices, customs, training, supervision, and

discipline concerning the constitutional duties of City officials—including, *inter alia*, to properly

document and disclose exculpatory information, and not to fabricate evidence by coercing

individuals into giving false testimonies and by creating falsified police records.

A.     **Policymakers for the Queens District Attorney's Office**

124.     Between 1977 and 2019, there were three District Attorneys for Queens County (collectively, the "DAs"): DA John J. Santucci (from January 1, 1977 to June 1, 1991), DA Richard A. Brown (from June 1, 1991 to May 4, 2019), and Acting DA John "Jack" M. Ryan (from May 4, 2019 to December 31, 2019).  During their respective tenures, the DAs were delegees of Defendant the City of New York and had general supervisory duties to administer and comply with existing federal and state laws and regulations and to establish policies, procedures, and practices for the QCDA.

125.     During their respective tenures, the DAs failed to take meaningful steps to ensure that ADAs in Queens County upheld their ethical obligations to disclose information that tended to exculpate charged defendants or information that could be used to impeach witnesses who testified against charged defendants.

126.     During the investigation of Ms. Robinson's murder and the prosecutions of Mr. Capers and Mr. McClinton, DA Brown was the elected District Attorney of Queens County and had the responsibility for formulating and implementing policies that discipline prosecutors when appropriate, and for establishing policies to be followed by prosecutors in case preparation including the taking and maintaining notes of witness interviews.

127.     Between approximately 1988 and 2019, John "Jack" M. Ryan was the Chief Assistant District Attorney of Queens County and the top aide to then-DA Brown.  As Chief Assistant, Ryan was a delegee of Defendant the City of New York and had general supervisory duties to administer and comply with existing federal and state laws and regulations and to establish policies, procedures, and practices for the QCDAO.

128.     During the investigation of Ms. Robinson's murder and the prosecutions of Mr. Capers and Mr. McClinton, DA Brown, as elected Queens County District Attorney, and his delegate Ryan were the final policymakers for Defendant the City of New York.

129.     Among other responsibilities, DA Brown and his delegate Ryan had responsibility for making policy decisions, including relating to establishing and formulating policies regarding: (a) notetaking when interviewing prosecution witnesses; (b) ensuring that ADAs upheld their ethical obligations to disclose information that tended to exculpate charged defendants or information that could be used to impeach witnesses who testified against charged defendants; and (c) investigating, sanctioning, and/or disciplining prosecutors for misconduct.

130.     During the investigation of Ms. Robinson's murder and the prosecutions of Mr. Capers and Mr. McClinton, DA Brown, as elected Queens County District Attorney, and his delegate Ryan were the final policymakers for Defendant the City of New York in regard to: (a) notetaking when interviewing prosecution witnesses; (b) ensuring that ADAs upheld their ethical obligations to disclose information that tended to exculpate charged defendants or information that could be used to impeach witnesses who testified against charged defendants; and (c) investigating, sanctioning, and/or disciplining prosecutors for misconduct.

**B.      <u>The Queens District Attorney's Office's Policy, Custom, and Practice of Not Taking Notes During Witness Interviews Such that Exculpatory Statements Are Not Recorded or Disclosed</u>**

131.     Prior to and at the time of the 2017 trial of Mr. Capers, Defendant the City of New York, through its final policymakers, Queens District Attorney Brown and his delegate Ryan, maintained a policy, custom, and practice that expressly trained and directed ADAs *not* to take notes when interviewing potential trial prosecution witnesses.

132.     The purpose of this policy, custom, and practice was to make sure that exculpatory or impeachment evidence of the prosecution's testifying witnesses would not be recorded so that such evidence would not be disclosed to the defense.

133.     This policy, custom, and practice relied on the false premise that as long as investigators or prosecutors did not write down or record exculpatory information, prosecutors had no obligation to disclose it.

134.     By contrast, the same policy, custom, and practice encouraged that notes be taken of non-prosecution witnesses so as to allow the prosecutors to impeach potential defense witnesses with prior inconsistent statements.

135.     Because of this policy, custom, and practice, ADA Theodorou and the other ADAs who investigated and prosecuted Mr. Capers took no notes of their interviews with prosecution witnesses Mr. Jappa and Mr. Bryant.

136.     Statements by Mr. Jappa and Mr. Bryant that tended to establish Mr. Capers's innocence were neither recorded nor disclosed to the defense.

137.     As a result of this carefully crafted policy that notes of prosecution witness interviews not be taken, Mr. Capers was deprived of his constitutional right to *Brady* material.

**C.     The Queens District Attorney's Office's Policy, Custom, and Practice of Failing to Discipline Trial Prosecutors for Misconduct**

138.     In the years before and during Mr. Capers's conviction, the QCDAO, including under DA Brown, had an extensive history of prosecutorial misconduct that caused constitutional violations, including, *inter alia*, *Brady* violations and knowing reliance on false testimony and argument and the failure to correct the same.

139.     QCDAO leadership knew that even a single instance of prosecutorial misconduct, if it led to no discipline, could poison the atmosphere of the entire office, as Acting DA Ryan

acknowledged during a sworn deposition in another prosecutorial misconduct matter.  Ryan also acknowledged the dire consequences inflicted on those who were wrongfully convicted and agreed that "such dire consequences to others justify dire consequences to prosecutors who act unethically."

140.     Defendant the City of New York was on actual and constructive notice of the misconduct of Queens County ADAs from at least the mid-1980s through the date of Mr. Capers's trial in 2017, by at least 65 appellate court decisions that alerted the final policymaker that defendants had been deprived of their constitutional rights because of prosecutorial misconduct.

141.     During Brown's tenure as District Attorney from 1991 to his death in 2019, DA Brown was well aware of his office's misconduct.

142.     Indeed, Brown purportedly "expressed concern" "about reversals that characterized the trial assistant engaging in what the courts like to call 'prosecutorial misconduct.'"

143.     At one point, Brown wrote to his top aide, Ryan, "Jack, I think we've been getting away with this sort of thing for a long time."

144.     Yet neither Brown, nor Ryan, nor any other QCDAO policymaker took any systemic action to address, prevent, or punish prosecutorial misconduct in the QCDAO.

145.     To the contrary, during the relevant period, the QCDAO, as delegee of Defendant the City of New York, had a policy, custom, and practice *not* to internally investigate, reprimand, sanction, or discipline prosecutors for misconduct.

146.     This policy, custom, and practice encouraged, condoned, and ratified the prosecutors' deliberate and reckless disregard of their constitutional and ethical duties.

147. As a result of this policy, custom, and practice, trial prosecutors and supervisors, including but not limited to the ADAs who investigated and prosecuted Mr. Capers for Ms. Robinson's murder, engaged in prosecutorial misconduct in a climate of impunity.

148. The historical failure of the QCDAO to discipline ADAs was known to Brown and Ryan, or, in the absence of their deliberate and reckless indifference, should have been known to the policymakers at and prior to the time of Mr. Capers's prosecution.

149. Discovery in other lawsuits arising from wrongful convictions obtained by the QCDAO, including, but not limited to, the cases of *Bellamy v. City of New York*, No. 12-CV-1025 (AMD) (PK); and *Bell v. City of New York*, No. 22-CV-3251 (DG) (PK)—which has included the exchange of documents and depositions of numerous current and former QCDAO employees and officials—has uncovered substantial evidence of policies, customs, and practices within the QCDAO to condone, encourage, and fail to remediate prosecutorial misconduct, including the suppression of *Brady* information.

150. As another example, in early 1996, the executive leadership of the QCDAO conducted a Prosecutorial Misconduct Survey (the "Survey").

151. The Survey found that, in at least 39 cases, either an appellate court held that the QCDAO committed misconduct (22 cases), or the QCDAO admitted misconduct absent such a finding (17 cases).

152. The QCDAO's prosecutorial misconduct in the Survey included all the above types of prosecutorial misconduct resulting in constitutional violations, including *Brady* and related discovery violations and improper reliance on false evidence.

153. The instances of misconduct covered by the Survey constituted a small portion of the total instances of misconduct the QCDAO had committed between 1988 and 1995. It did not

include numerous additional instances between 1985 and 1988, when Brown was an appellate division justice and became aware of the pervasiveness of prosecutorial misconduct in the QCDAO.

154.    Additionally, a number of prosecutors apparently failed to respond to the Survey, and the Survey missed more recent misconduct of a number of prosecutors who had left the QCDAO.

155.    As a result, at least 19 decisions (almost all appellate cases) *not* reflected in the Survey found additional prosecutorial misconduct by the QCDAO between 1991 and 1995.

156.    The additional misconduct cited in these decisions was wide ranging, including *Brady* violations, improperly eliciting evidence at trial, and improperly coaching a prosecution witness at trial.

157.    The QCDAO's failure to include any of the additional misconduct in the Survey is further evidence of deliberate indifference to prosecutorial misconduct in the office.

158.    Nothing in the Survey surprised or could have surprised the QCDAO's leadership. From the beginning of his tenure in 1991, Brown routinely read appellate decisions in QCDAO cases.  Those cases formed the basis for the results of the Survey.

159.    Notwithstanding the damning findings of the Survey, the City has admitted that, in response to the Survey, the QCDAO:

    a.    failed to change any QCDAO policy;

    b.    failed to change any QCDAO practice;

    c.    failed to change any QCDAO procedure;[11]

    d.    failed to discipline any QCDAO prosecutor;

---

11. The QCDAO claims to have made minor, albeit undefined, adjustments to its training for a small fraction of prosecutors in response to the Survey.

e.  failed to change its disciplinary process for QCDAO prosecutors (indeed, there was no process);

f.  failed to identify which prosecutors committed the misconduct in the Survey;

g.  failed to incorporate prosecutorial misconduct, including but not limited to court findings of prosecutorial misconduct, into employment evaluations of QCDAO prosecutors;

h.  failed to make any changes to the way prosecutors were evaluated;

i.  failed to make any changes to the way prosecutors were supervised;

j.  failed to create additional oversight by Brown or any executive in the QCDAO;

k.  failed to change any hiring practices for QCDAO prosecutors;

l.  failed even to inform trial QCDAO prosecutors about the results of the Survey;

m.  failed to inform appellate QCDAO prosecutors about the results of the Survey;

n.  failed to have any office-wide meeting to discuss the Survey or response to the Survey;

o.  failed to track QCDAO prosecutorial misconduct post-Survey;

p.  failed to analyze QCDAO prosecutorial misconduct, by type, by prosecutor, or by any other method; and

q.  failed to do any follow-up prosecutorial misconduct survey.

160.   DA Brown took no action at all in response to the Survey.

161.   In short, policymakers at the QCDAO, acting with deliberate indifference, took no corrective measures in response to the Survey and instead allowed the misconduct to continue.

162.   As such, in the years that have followed, prosecutors under DA Brown have had a high number of their convictions reversed.

163.   For example, in 2008, the conviction of Kareem Bellamy was vacated based on newly discovered evidence supporting Mr. Bellamy's innocence and pointing to third-party guilt. Mr. Bellamy had been wrongfully convicted in 1995 and served more than 14 years in prison for a crime he did not commit.

164.    After the QCDAO moved to vacate the decision granting Mr. Bellamy a new trial, the court denied the QCDAO's motion, reaffirmed its earlier ruling vacating the conviction, and additionally found multiple *Brady* violations.

165.    In 2012—just one year before Ms. Robinson's murder—Mr. Bellamy filed a federal civil rights lawsuit against the City of New York and the police officers in his case, alleging many of the same prosecutorial misconduct and constitutional violations that occurred here. Mr. Bellamy ultimately reached a settlement of $8 million with the City of New York.

166.    Discovery conducted in the Bellamy case helped reveal the depth and breadth of the QCDAO's failure to discipline prosecutors during DA Brown's tenure.

167.    Senior members of Brown's staff admitted in depositions that there was little to no formal discipline after cases were overturned on grounds of misconduct.

168.    Indeed, upon information and belief, only one ADA was forced out of the QCDAO for such violations since Brown took office in 1991.

169.    After 2012, DA Brown had created a Committee on Professional Standards, but in depositions taken in 2019, four veteran prosecutors testified they had never even heard of the committee or received written disciplinary policies.

170.    One such prosecutor said under oath, "That's the first time [I'm] hearing of it."

171.    Brown's committee never published its reviews or findings.

172.    In a 2019 deposition, Ryan acknowledged that no one had been suspended, been demoted, been denied a promotion, or even lost vacation days for failing to disclose exculpatory evidence to the defense or for making improper statements at trial.

173.    Ryan testified that he could not recall a time an ADA received a negative evaluation for failing to disclose exculpatory evidence.

174.    As the Bellamy case showed, the deliberate indifference of the QCDAO policymakers, including DA Brown and his designees, created a culture of prosecutorial misconduct that they knew was highly likely to result in further violations and which, in fact, did so in numerous cases, including Mr. Capers's case.

175.    This QCDAO culture, where winning mattered more than following the Constitution, was a proximate cause of the violations of Mr. Capers's rights and his resulting injuries.

176.    The QCDAO's policy, custom, and practice of allowing prosecutors to commit prosecutorial misconduct in dozens of cases, without consequence, made it foreseeable to Defendant the City of New York that prosecutors would commit misconduct in Mr. Capers's case, including withholding *Brady* material and improperly relying on false evidence.

177.    All the above unlawful policies, practices, procedures, and customs of Defendant the City of New York were a substantial factor in bringing about the violations of Mr. Capers's rights under the Constitution and laws of the United States, including the Fourth, Fifth, and Fourteenth Amendments, and in causing his wrongful conviction, imprisonment, and related damages.

## DAMAGES

178.    This action seeks damages for the period from July 30, 2014 (the date of Mr. Capers's arrest) through the present.  Defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith, and/or malicious acts, misdeeds, and omissions caused Mr. Capers to be maliciously prosecuted, unfairly tried, and wrongfully convicted, and to endure nearly 8.5 years of wrongful imprisonment, including the physical and mental damage arising therefrom.

179.    Mr. Capers was only 16 years old at the time of his incarceration and was released in 2022 at age 24.

180.    He spent his final teenage years and a formative period of his life imprisoned for a crime he did not commit, serving his sentence in various maximum-security prisons throughout New York State.

181.    During his wrongful imprisonment, Mr. Capers suffered extreme hardships, including, without limitation, physical assault, psychological abuse, extreme degradation, pain and suffering, and the loss of nearly 8.5 years of his life.  Mr. Capers also lost tremendous opportunities.  He lost precious time with his family and friends, including with his young daughter, who was only several months old at the time of his arrest.

182.    As a direct and proximate result of the acts of Defendants, the injuries and damages sustained by Mr. Capers, arising from the deprivation of his civil rights, include: the violations of his clearly established rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; personal injuries; past and future pain and suffering; past and future severe mental anguish; past and future emotional distress; extreme fear; economic damages including loss of income and diminution in future earning potential and the inability to obtain certain professional licenses; infliction of physical illness and injury resulting from his confinement; humiliation, indignities, embarrassment, degradation, and egregious injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal care, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

183.     All the alleged acts, misdeeds, and omissions committed by Individual Defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of Individual Defendants meets all the standards for imposition of punitive damages.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983

*Denial of Due Process and Right to a Fair Trial,
Fabrication of Evidence, and Suppression of* Brady *Information*

*(United States Constitution Amendments V and XIV)*

### Against All Individual Defendants

184.     Mr. Capers repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

185.     Individual Defendants, acting knowingly, intentionally, deliberately, with malice, and under color of law, deprived Mr. Capers of his clearly established rights under the Fifth and Fourteenth Amendments to the United States Constitution to due process and a fair trial.  They did so by: (a) falsely representing that the NYPD had received information within two days of the murder that there were two shooters; (b) falsely representing that they "confirmed" that Mr. Capers was in South Carolina as of June 3, 2013; (c) coercing Mr. Capers to make false, self-incriminating statements; (d) otherwise fabricating, causing the fabrication of, or failing to intervene in the fabrication of false witness statements through improper coercion of witnesses, threats, promises of consideration, and/or other misconduct; (e) manufacturing, causing the manufacturing of, or failing to intervene in the manufacturing of false or misleading evidence by

creating falsified police reports; and (f) suppressing, causing the suppression of, or failing to intervene in the suppression of *Brady* information.

186.    No person of reasonable caution and acting in good faith, having the knowledge and information Individual Defendants had, would have been warranted in concluding that Mr. Capers was involved in the murder of D'Aja Robinson, such as to support a probable cause determination.  Even setting aside their knowledge that they had used manufactured evidence and testimony, coerced witnesses, and suppressed *Brady* information, Individual Defendants knew or, in the absence of deliberate indifference, recklessness, and gross negligence, should have known that there were numerous reasons for skepticism about information implicating Mr. Capers.  These include but are not limited to: (a) the complete absence of physical and forensic evidence tying Mr. Capers (or any second shooter) to the murder, (b) numerous witness statements identifying a single shooter, and (c) numerous witness statements identifying Mr. McClinton as the shooter.

187.    The presumption of probable cause created by the grand jury indictment is overcome by the fact that Mr. Capers's indictment was secured based on bad-faith police misconduct—including, without limitation, fabrication of false evidence and suppression of *Brady* information.

188.    Individual Defendants knew, intended, or were deliberately indifferent to the fact that the false and misleading evidence would deprive Mr. Capers of a fair trial and result in his wrongful conviction and incarceration.

189.    Individual Defendants knew, intended, or were deliberately indifferent to the fact that *Brady* information would be concealed from Mr. Capers and his attorney.

190.    Individual Defendants' conduct, committed in concert with one another or others, deprived Mr. Capers of his rights under the Constitution: (a) not to be prosecuted, convicted, or imprisoned based on false, fabricated, manufactured, or misleading evidence in violation of the Due Process and Fair Trial Clauses of the Fifth and Fourteenth Amendments to the United States Constitution; and (b) to timely disclosure of material evidence favorable to the defense under *Brady* in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution.

191.    Individual Defendants' acts and omissions proximately caused the continuation of Mr. Capers's criminal prosecution, his conviction, his loss of liberty and detention, and his resulting damages.

192.    Individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Mr. Capers's constitutional rights.

193.    Individual Defendants' falsification of evidence, coercion of the witnesses, and arrest of Mr. Capers without probable cause establishes that they acted with actual malice.

194.    The prosecution terminated in Mr. Capers's favor when his conviction was eventually vacated and the indictment against him dismissed.

195.    Mr. Capers was, in fact, innocent of the crime for which he was convicted and incarcerated.

196.    Individual Defendants' actions were willful, malicious, oppressive, and reckless, and were of such a nature that punitive damages should be imposed.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983

*Malicious Prosecution and Denial of Fourth Amendment Rights*

*(United States Constitution Amendments IV and XIV)*

### Against All Individual Defendants

197.    Mr. Capers repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

198.    Individual Defendants, acting individually and in concert, with malice, under color of law, and knowing that probable cause did not exist to arrest Mr. Capers and prosecute him for the murder of Ms. Robinson, caused Mr. Capers to be arrested, charged, and prosecuted for that crime, thereby violating Mr. Capers's clearly established right under the Fourth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures.

199.    Specifically, Individual Defendants, with malice, knew or in the absence of their deliberate and reckless indifference to the truth should have known, that probable cause did not exist to arrest and prosecute Mr. Capers, including but not limited to the facts that the witness statements and identifications of Mr. Capers were fabricated by Individual Defendants and the product of improper coercion of witnesses, and wholly unreliable, and that those factors as well as additional material exculpatory and impeachment evidence that Individual Defendants and others did not disclose undermined the evidence presented in support of a probable cause finding against Mr. Capers.

200.    In addition, Individual Defendants, acting individually and in concert, knowingly, intentionally, deliberately, and with malice, misrepresented the truth and withheld exculpatory facts from prosecutors and the grand jury that vitiated probable cause against Mr. Capers,

including but not limited to their: (a) falsely representing that the NYPD had received information within two days of the murder that there were two shooters; (b) falsely representing that they "confirmed" that Mr. Capers was in South Carolina as of June 3, 2013; (c) coercing Mr. Capers to make false, self-incriminating statements; (d) otherwise fabricating, causing the fabrication of, or failing to intervene in the fabrication of false witness statements through improper coercion of witnesses, threats, promises of consideration, and/or other misconduct; (e) manufacturing, causing the manufacturing of, or failing to intervene in the manufacturing of false or misleading evidence by creating falsified police reports; and (f) suppressing, causing the suppression of, or failing to intervene in the suppression of *Brady* information.  Individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Mr. Capers's constitutional rights.

201.    Individual Defendants initiated and continued the prosecution against Mr. Capers without probable cause, in violation of Mr. Capers's clearly established constitutional rights.  No reasonable officer at the time of Mr. Capers's prosecution or thereafter would have believed this conduct was lawful.

202.    The prosecution terminated in Mr. Capers's favor when his conviction was eventually vacated and the indictment against him dismissed.

203.    Mr. Capers was, in fact, innocent of the crime for which he was convicted and incarcerated.

204.    As a direct and proximate result of the individual Defendants' conduct, Mr. Capers was maliciously prosecuted, wrongly convicted, imprisoned for nearly 8.5 years, and suffered the other grievous damages and injuries set forth above.

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983

*Monell v. Department of Social Services*, 436 U.S. 658 (1978)

### Against Defendant the City of New York

205.   Mr. Capers repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

206.   At the time of Mr. Capers's arrest and prosecution, the QCDAO, an agency of Defendant the City of New York, created and maintained policies, customs, and practices of deliberate indifference to violations of its employees of the constitutional rights of individuals who were investigated and criminally prosecuted, including through: (a) causing false witness statements through improper coercion of witnesses, threats, promises of consideration, and/or other misconduct; (b) training and directing ADAs to not to take notes when interviewing potential trial prosecution witnesses; (c) suppressing, causing the suppression of, or failing to intervene in the suppression of *Brady* information; (d) failing to discipline ADAs for violating the constitutional rights of criminal suspects and defendants, including failures to disclose *Brady* information; and (e) covering up these unlawful practices.

207.   The violations of Mr. Capers's constitutional rights and his resulting injuries were proximately and foreseeably caused by conduct, chargeable to the City, amounting to deliberate indifference to the constitutional rights of persons, including Mr. Capers, subject to arrest and investigation by the NYPD, including:

    a.   the institution and implementation of inadequate and unlawful policies, procedures, and customs concerning:

        i   the duty not to create or use false or misleading evidence, testimony, and witness statements during criminal proceedings, including bail hearings, pretrial hearings, trials, and post-conviction proceedings;

    ii   the continuing obligation to correct false, inaccurate, incomplete, or misleading evidence, testimony, and statements whenever such misconduct is discovered to have occurred, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means; and

    iii   the continuing duty to obtain, preserve, and timely disclose, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution witnesses; and

    b.   the failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

208.    The foregoing express or *de facto* policies, practices, and customs (including the failure to properly instruct, train, supervise, or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the City, who knew that such policies, procedures, regulations, practices, and customs implicated issues that regularly arise in the investigation and prosecution of criminal cases.

209.    The City knew of the unconstitutional conduct occurring among its employees in light of the numerous credible allegations, many substantiated by judicial decisions, that its employees: (a) wrongfully withheld, lost, or destroyed evidence favorable to the defense that was required to be timely disclosed to the defense under *Brady*; and (b) had presented or failed to correct false or misleading identifications, testimonies, and statements from witnesses.

210.    Despite this knowledge, the supervisory and policymaking officers and officials of the City perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, practices, and customs; did not effectively instruct, train, or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority; had no employee handbook or other published practices, policies, or procedures for investigating and disciplining prosecutors who had engaged in *Brady* violations and related

constitutional violations; and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead tolerated the policies, procedures, regulations, practices, and customs, described above, with deliberate indifference to the effect their actions would have upon the constitutional rights of individuals and citizens of the City and State of New York.

211.    The aforesaid policies, practices, and customs of the City were substantial, contributing factors in bringing about the aforesaid violations of Mr. Capers's rights under the Constitution and laws of the United States and in causing his wrongful conviction and resulting damages.

212.    The supervisory and policymaking officers and officials of the City were deliberately indifferent to the manner in which convictions were secured without regard to defendants' constitutional rights or guilt.  The violations of defendants' rights were endemic, and the City was aware of these practices but did not take corrective or preventative action to correct it.

## FOURTH CAUSE OF ACTION

### Malicious Prosecution

*New York State Law*

### Against All Defendants

213.    Mr. Capers repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

214.    Individual Defendants, acting individually and in concert, with malice, and knowing that probable cause did not exist to arrest Mr. Capers and prosecute him for the murder of Ms. Robinson, caused Mr. Capers to be arrested, charged, and prosecuted for that crime.

215.     Specifically, Individual Defendants, with malice, knew or in the absence of their deliberate and reckless indifference to the truth should have known, that probable cause did not exist to arrest and prosecute Mr. Capers, including but not limited to the facts that the witness statements and identifications of Mr. Capers were fabricated by Individual Defendants and the product of improper coercion of witnesses, and wholly unreliable, and that those factors as well as additional material exculpatory and impeachment evidence that Individual Defendants did not disclose undermined the evidence presented in support of a probable cause finding against Mr. Capers.

216.     In addition, Individual Defendants, acting individually and in concert, knowingly, intentionally, deliberately, and with malice, misrepresented the truth and withheld exculpatory facts from prosecutors and the grand jury that vitiated probable cause against Mr. Capers, including but not limited to their having: (a) falsely representing that the NYPD had received information within two days of the murder that there were two shooters; (b) falsely representing that they "confirmed" that Mr. Capers was in South Carolina as of June 3, 2013; (c) coercing Mr. Capers to make false, incriminating statements; (d) otherwise fabricating, causing the fabrication of, or failing to intervene in the fabrication of false witness statements through improper coercion of witnesses, threats, promises of consideration, and/or other misconduct; (e) manufacturing, causing the manufacturing of, or failing to intervene in the manufacturing of false or misleading evidence by creating falsified police reports; and (f) suppressing, causing the suppression of, or failing to intervene in the suppression of *Brady* information.

217.     Individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Mr. Capers's constitutional rights.

218.    Individual Defendants initiated and continued the prosecution against Mr. Capers without probable cause.

219.    The prosecution terminated in Mr. Capers's favor when his conviction was eventually vacated and the indictment against him dismissed.

220.    Mr. Capers was, in fact, innocent of the crime for which he was convicted and incarcerated.

221.    Defendant the City of New York is liable under the doctrine of *respondeat superior* for the malicious prosecution of Mr. Capers by Individual Defendants, all of whom were acting as agents of the City of New York and within the scope of their employment.

222.    As a direct and proximate result of Defendants' conduct, Mr. Capers was maliciously prosecuted, wrongly convicted, imprisoned for nearly 8.5 years, and suffered the other grievous damages and injuries set forth above.

### FIFTH CAUSE OF ACTION

**New York State Constitution**

*Denial of Due Process and Right to a Fair Trial, Fabrication of Evidence,
Suppression of Exculpatory Information, and Malicious Prosecution*

*(New York State Constitution, Article I, §§ 5, 6, and 12)*

**Against All Defendants**

223.    Mr. Capers repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

224.    The acts and omissions described above caused violations of Mr. Capers's rights under the New York State Constitution, including the rights to due process and to be free from unreasonable searches and seizures, and Mr. Capers's resulting damages.

225.    To the extent that any of Mr. Capers's claims against one or more Defendants is unavailable under 42 U.S.C. § 1983—including, but not limited to, 42 U.S.C. § 1983's lack of *respondeat superior* liability—Mr. Capers retains a legal remedy for such claims under the New York State Constitution.

## SIXTH CAUSE OF ACTION

### Negligence

*New York State Law*

### Against Defendant the City of New York

226.    Mr. Capers repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

227.    Defendant the City of New York is liable for negligence, having breached its duty of reasonable care to Mr. Capers.

228.    Specifically, and by way of example, the City intentionally, recklessly, negligently, and/or with deliberate indifference failed to adequately train, supervise, and discipline its agents and employees with regard to the matters described above.  The City of New York's inadequate training, supervision, and discipline proximately caused the misconduct described above and Mr. Capers's wrongful conviction and resulting damages.

229.    The City's negligence and gross negligence directly and proximately caused Mr. Capers to be wrongly prosecuted and imprisoned for nearly 8.5 years.

230.    Mr. Capers was, in fact, innocent of the crime for which he was convicted and incarcerated.  Mr. Capers's cause of action for negligence was unavailable to him until his prosecution finally terminated in his favor, when his conviction was eventually vacated and the

indictment against him dismissed.  Furthermore, this cause of action is tolled as the City concealed from Mr. Capers the conduct giving rise to this cause of action.

231.    As a direct and proximate result of Defendants' conduct, Mr. Capers was maliciously prosecuted, wrongly convicted, imprisoned for 8.5 years, and suffered the other grievous damages and injuries set forth herein.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Shamel Capers demands judgment against the above captioned Defendants as follows:

a.   for compensatory damages to be determined at trial, but in all events no less than $20 million;

b.   for punitive damages against Individual Defendants in an amount to be determined at trial;

c.   for reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988 and other applicable laws;

d.   for pre- and post-judgment interest as allowed by law; and

e.   for such other relief as this Court deems just and proper.

Dated:          February 15, 2024
                New York, New York


                                    Respectfully submitted,

                             By: _____
                                    David B. Shanies
                                    Deborah I. Francois
                                    Shanies Law Office
                                    110 West 40th Street, 10th Floor
                                    New York, New York 10018
                                    (212) 951-1710
                                    david@shanieslaw.com
                                    deborah@shanieslaw.com


                                    Elizabeth A. Geddes
                                    Nadia I. Shihata
                                    Shihata & Geddes LLP
                                    155 Water Street
                                    Brooklyn, New York 11201
                                    (646) 974-1143
                                    liz@shihatageddes.com
                                    nadia@shihatageddes.com


                                    Winston M. Paes
                                    Elizabeth Costello
                                    Anna M. Rennich
                                    Debevoise & Plimpton LLP
                                    66 Hudson Boulevard
                                    New York, New York 10001
                                    (212) 909-6000
                                    wmpaes@debevoise.com
                                    ecostello@debevoise.com
                                    amrennic@debevoise.com

                                    *Attorneys for Plaintiff Shamel Capers*