UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

SHAMEL CAPERS,                                           **MEMORANDUM AND ORDER**
                                                         24-CV-1219 (RPK) (CLP)
                            Plaintiff,

            v.

THE CITY OF NEW YORK, DANIEL
GALLAGHER, ANTHONY FARANDA,
PETER GALASSO, and JOHN/JANE
DOES 1–25,

                            Defendants.

-------------------------------------------------------x

RACHEL P. KOVNER, United States District Judge:

Shamel Capers brings this action alleging that he was wrongfully convicted of a murder after law enforcement officers fabricated evidence against him and prosecutors from the Queens County District Attorney's Office ("QCDAO") failed to disclose exculpatory evidence. He sues three named police detectives as well as the City of New York. The City has moved to dismiss two of plaintiff's claims against it: a claim for municipal liability under 42 U.S.C. § 1983 and a claim for negligence under state law. As explained below, the City's motion is granted.

## BACKGROUND

The following facts are taken from the amended complaint and are assumed true for purposes of this order.

In May 2013, a fourteen-year-old girl named D'Aja Robinson was shot and killed while riding in a New York City bus. *See* Am. Compl. ¶ 1 (Dkt. #33). In the days after the murder, eyewitnesses identified Kevin McClinton as the shooter. *See id.* ¶ 2. Approximately two weeks

1

after the shooting, McClinton was arrested in Cayce, South Carolina.  *See id.* ¶ 3. McClinton claimed following his arrest that plaintiff had shot Robinson.  *See id.* ¶ 48.

Plaintiff's central claims in this lawsuit are that individual defendants Daniel Gallagher, Anthony Faranda, and Peter Galasso—all detectives of the New York City Police Department ("NYPD")—caused the presentation of false evidence that plaintiff was involved in the shooting, including by telling witnesses what they should say about plaintiff's role, *see id.* ¶¶ 12, 99, 113–15, and by coercing plaintiff to say that he had fled to South Carolina along with McClinton, *see id.* ¶¶ 12, 15, 51, 86.  Plaintiff alleges that these defendants and prosecutors from the QCDAO then failed—in violation of *Brady v. Maryland*, 373 U.S. 83 (1963)—to disclose exculpatory evidence in advance of the trial that led to plaintiff's conviction for murder.  Am. Compl. ¶¶ 12–13, 138, 139–89.  Plaintiff alleges that all the individual defendants were acting within the scope of their employment and under the color of law when they committed the acts alleged in the complaint. *Id.* ¶ 23.

With respect to his claims about the coaching of witnesses, plaintiff alleges that in April 2014, Lael Jappa, an associate of McClinton's and an eyewitness at Robinson's murder, was arrested on felony charges.  *See id.* ¶ 56.  Jappa met with prosecutors from the QCDAO and entered into a cooperation agreement "in exchange for significant leniency at his sentencing." *Ibid.*  "Other than two very short reports" describing Jappa identifying photographs of McClinton and plaintiff, "there are no notes or reports that document" what Jappa told the QCDAO about "Robinson's murder or any other topic during" their meetings." *Id.* ¶ 57.  In May 2015, Jappa testified before the grand jury that indicted plaintiff for Robinson's murder. *Id.* ¶ 60, 62.  He testified that McClinton had introduced him to plaintiff at a community gathering the day of the murder near where the shooting occurred, that plaintiff was carrying a firearm at the time, and that he later saw

plaintiff "shoot a gun in the direction of the bus." *Id.* ¶ 62.  Jappa also offered incriminating testimony at plaintiff's trial, telling the jury that plaintiff "was acting suspicious" and that he "point[ed] a firearm toward the back of the bus." *Id.* ¶¶ 76–80.

During a subsequent investigation by the QCDAO Conviction Integrity Unit, Jappa stated that the version of events to which he testified at trial had been provided to him by "one or more of [the] Individual Defendants" during his "meetings with the QCDAO." *Id.* ¶ 99.  He explained that one or more of those defendants "ma[de] clear that [he] needed to reiterate that version to secure a cooperation agreement." *Ibid.*  He also directed Conviction Integrity Unit investigators to recorded phone calls he had made to his mother while incarcerated. *Id.* ¶¶ 99–100.  During those calls, which were in the possession of the QCDAO before and during plaintiff's trial, Jappa described his cooperation with prosecutors as "based on lies." *Id.* ¶¶ 99–101.

Plaintiff alleges that Raquan Bryant also offered "[f]abricated [t]estimony" at his trial. *Id.* at 18.  He alleges that in May 2015 and August 2015, Bryant met with prosecutors from the QCDAO. *Id.* ¶ 64.  Like Jappa, Bryant faced multiple felony charges and entered into a cooperation agreement in exchange for leniency at his sentencing. *See ibid.*  Other than one report describing Bryant's identification of a photograph of plaintiff, there "are no notes or reports documenting" what Bryant told the QCDAO during their meetings. *Ibid.* At plaintiff's trial, Bryant corroborated Jappa's testimony that plaintiff attended a community gathering with McClinton the day of the shooting and was carrying a firearm at the time. *See id.* ¶¶ 81–85.

Plaintiff was convicted at trial. *Id.* ¶ 89.  He was sentenced to a term of imprisonment of fifteen years to life. *Id.* ¶ 90.

Plaintiff's conviction was investigated by the QCDAO Conviction Integrity Unit and ultimately vacated.  In addition to uncovering the evidence noted above that Jappa's testimony had

been fabricated, the Conviction Integrity Unit investigation identified other exculpatory evidence that had been in QCDAO's possession prior to plaintiff's conviction, but that had not been disclosed to plaintiff. This evidence included recorded phone calls McClinton placed in the days after his arrest in which he "directed an associate to tell others that they needed to falsely implicate" plaintiff, *id.* ¶¶ 102–03, and Facebook messages written by Bryant that contradicted his trial testimony, *see id.* ¶¶ 104–07. At the request of the QCDAO and plaintiff's attorneys, plaintiff's conviction was vacated based on newly discovered evidence. *Id.* ¶ 7.

Plaintiff alleges that the individual defendants' misconduct was connected to the QCDAO policies in several ways. First, he alleges that the district attorney and chief assistant district attorney "maintained a policy, custom, and practice that expressly trained and directed [Assistant District Attorneys] to ensure that virtually no notes were taken when interviewing potential trial prosecution witnesses," and that "[t]he purpose of this policy, custom, and practice was to make sure that exculpatory or impeachment evidence of the prosecution's testifying witnesses would not be recorded so that such evidence would not be disclosed to the defense." *Id.* ¶¶ 132–33. Plaintiff alleges that as a result, the assistant district attorneys "who investigated and prosecuted [plaintiff] took no notes of their interviews with" Jappa and Bryant, and that plaintiff was thereby "deprived of his constitutional right to *Brady* material." *Id.* ¶¶ 136, 138.

Plaintiff further alleges that the constitutional violations were customary at the QCDAO. To support that claim, the amended complaint notes that the QCDAO leadership conducted a survey in 1996 that described multiple instances of misconduct by the QCDAO prosecutors. *See id.* ¶¶ 155–63. The amended complaint also lists more than 100 criminal appeals "[b]etween 1985 and [plaintiff]'s trial in 2017" that reversed convictions in part due to "evidence of prosecutorial misconduct" by QCDAO. *Id.* ¶ 144; *see id.* at 55–74. Of these, the complaint alleges that

"approximately 30" involved "*Brady* material or material discoverable pursuant to *People v. Rosario*, 9 N.Y.2d 286 (1961)." *Id.* ¶ 144.  In addition, the amended complaint alleges that the QCDAO leadership, including the district attorney from 1991 through plaintiff's trial, was aware of these incidents and did not take "any systemic action to address, prevent, or punish prosecutorial misconduct." *Id.* ¶ 149; *see id.* ¶¶ 143–48.

Plaintiff also alleges that the QCDAO "failed to adequately train QCDAO prosecutors on their *Brady*" obligations, *id.* ¶ 139, and failed to supervise prosecutors in their exercise of *Brady* obligations, *id.* ¶ 140.

Plaintiff filed this lawsuit in February 2024.  *See* Compl. (Dkt. #1).  The amended complaint asserts six causes of action.  *Id.* ¶¶ 196–243.  Two involve only the individual defendants: plaintiff alleges that these defendants engaged in malicious prosecution and deprived plaintiff of his constitutional rights to due process and a fair trial.  *Id.* ¶¶ 196–216.  Another two causes of action are directed at all defendants: plaintiff alleges that defendants violated his due process rights under the New York State Constitution and that they violated state-law prohibitions on malicious prosecution.  *Id.* ¶¶ 225–37.  The final two causes of action are directed only at the City.  One is a Section 1983 claim pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), alleging that the City "created and maintained policies, customs, and practices of deliberate indifference to violations of its employees of the constitutional rights of" criminal defendants.  *Id.* ¶¶ 217–24.  The other is a state-law negligence claim.  *Id.* ¶¶ 238–43.  The City moves to dismiss these last two causes of action under Federal Rule of Civil Procedure 12(b)(6). *See* Mot. to Dismiss (Dkt. #44); Opp'n (Dkt. #46).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." To avoid dismissal on that basis, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (discussing Fed. R. Civ. P. 8). The facial "plausibility standard is not akin to a 'probability requirement,'" but it requires a plaintiff to allege sufficient facts to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof [of the facts alleged] is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (quotation marks and citation omitted).

At the motion-to-dismiss stage, a court may consider only (1) the complaint itself, (2) documents either attached to the complaint or incorporated in it by reference, (3) documents the plaintiff relied on and knew of when bringing suit, and (4) matters in the public record that are subject to judicial notice. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). When reviewing the complaint on a motion to dismiss, the court must accept all facts alleged in a complaint as true, *Iqbal*, 556 U.S. at 678, and "draw[] all reasonable inferences in favor of the plaintiff," *Buon v. Spindler*, 65 F.4th 64, 76 (2d Cir. 2023). The court, however, is not obligated to adopt "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action" that are not "supported by factual allegations." *Iqbal*, 556 U.S. at 678.

6

**DISCUSSION**

The City's motion to dismiss plaintiff's *Monell* and negligence claims is granted.

## I. Municipal Liability Under Section 1983

Plaintiff fails to adequately plead a *Monell* claim. Under *Monell*, to state a Section 1983 claim against a city for the acts of its employees, a plaintiff must plausibly allege "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010) (citation omitted). "A plaintiff can establish an official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff and others encountering those subordinates." *Gem Fin. Serv., Inc. v. City of New York*, 298 F. Supp. 3d 464, 490 (E.D.N.Y. 2018); *accord Jones v. Westchester County*, 182 F. Supp. 3d 134, 158 (S.D.N.Y. 2016). The "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

Plaintiff proffers three theories of *Monell* liability in connection with the constitutional violations alleged to have occurred during his prosecution: (1) that the *Brady* violations in his case were the product of a policy officially endorsed by the municipality because the QCDAO had a policy of ensuring no notes were taken during witness interviews; (2) that failing to disclose exculpatory evidence constituted a widespread and persistent QCDAO practice of which policymakers must have been aware; and (3) that policymakers failed to train and discipline

prosecutors in connection with their obligations under *Brady*.  *See* Am. Compl. ¶ 218; Opp'n 10–24.  Even assuming that plaintiff has plausibly alleged *Brady* violations on the part of the individual defendants, none of his three *Monell* theories is adequately pleaded.

### A.    Lack of Notetaking

Plaintiff fails to plausibly allege that defendant's purported no-notetaking policy caused a constitutional violation.

To adequately plead a *Monell* claim, a "plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).  A plaintiff "seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Id.* at 407 (quoting *Canton*, 489 U.S. at 388).

Plaintiff alleges that the QCDAO "maintained a policy, custom, and practice that expressly trained and directed ADAs to ensure that virtually no notes were taken when interviewing potential trial prosecution witnesses, including that ADAs were to take no notes of such interviews even when they were the only personnel present at such interviews." Am. Compl. ¶ 132.  A policy of refraining from notetaking is generally lawful: nothing in the Constitution "requires the Government to take notes during witness interviews." *United States v. Rodriguez*, 496 F.3d 221, 224 (2d Cir. 2007).  True, the Second Circuit has left open the question of whether such a policy may be unconstitutional if adopted for an improper purpose—that is, whether "the Government, for the purpose of avoiding the disclosure of the initial falsities and inconsistencies of persons who may become Government trial witnesses, may permissibly instruct an agent not to follow the customary practice of taking notes of witness interviews." *Id.* at 225 n.3.  But the amended

8

complaint does not cite any facts that render plausible the claim that the government maintained a policy against notetaking for the purpose of avoiding the disclosure of falsities or inconsistencies. To the contrary, the amended complaint makes only the bald assertion that the policy had this purpose. Because plaintiff "points to no evidence to support an improper motive," *Baity v. Kralik*, 51 F. Supp. 3d 414, 443 (S.D.N.Y. 2014), his allegations "do not rise above the level of 'conclusory, boilerplate language,'" *see Folk v. City of New York*, 243 F. Supp. 3d 363, 377 (E.D.N.Y. 2017) (quoting *Bradley v. City of New York*, 08-cv-1106, 2009 WL 1703237, at *3 (E.D.N.Y. June 18, 2009)).

Because the notetaking policy that plaintiff alleges is a "facially lawful" one, the policy could support *Monell* liability only if plaintiff plausibly alleged a "direct causal link" between the municipal policy and the constitutional violations he alleges. *See Brown*, 520 U.S. at 404–05. The Supreme Court has emphasized that this standard is demanding and presents "difficult problems of proof" for plaintiffs, explaining that "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405–06. Just because "a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee," that "will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the *employee* acted culpably." *Id.* at 406–07.

Plaintiff's pleadings do not meet this "rigorous" causation standard because they do not show that *Brady* violations were a "known or obvious consequence[]" of the "facially lawful" policy of not taking notes during witness meetings. *See id.* at 405, 407 (citation omitted). To start, while plaintiff alleges that Jappa's and Bryant's statements "were neither recorded nor disclosed to the defense," Am. Compl. ¶ 137, he provides no facts plausibly suggesting that the lack of recording "direct[ly] caus[ed]" the *Brady* violations, *Canton*, 489 U.S. at 385; *see*

9

*Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985) (requiring "at least an affirmative link between" the policy "and the particular constitutional violation at issue").  He offers no evidence that the prosecutors handling his case—let alone QCDAO policymakers—viewed the policy against written notes as a means of circumventing *Brady* obligations, *see* Am. Compl. ¶¶ 132–38, or declined to turn over *Brady* material "because of" the no-notetaking policy, *see Hernandez v. United States*, 939 F.3d 191, 207–08 (2d Cir. 2019).  Indeed, given prosecutors' obligation to turn over *Brady* material regardless of whether that material is written down, *see Rodriguez*, 496 F.3d at 222, "the requisite causal link between the municipal policy and the alleged denial of a constitutional right is extraordinarily attenuated," *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 601 (S.D.N.Y. 2013).  And because ADAs "are not only equipped but are also ethically bound to know what *Brady* entails and to perform legal research when they are uncertain," *Connick v. Thompson*, 563 U.S. 51, 66–67 (2011), it is far from "obvious" that a policy of not taking notes in witness meetings would result in *Brady* violations, *Brown*, 520 U.S. at 407.

The examples plaintiff cites in his complaint dealing with the QCDAO's past *Brady* violations likewise fail to raise a plausible inference that the constitutional violations in his case were the product of the office's notetaking policy.  *See* Am. Compl. at 55–74.  These cases contain no hint that this policy was the "moving force" behind any of the violations alleged.  *Brown*, 520 U.S. at 404.  Nor does plaintiff appear to argue as much, as he does not identify a single case in which a court found the office's notetaking policy relevant to the *Brady* analysis.  *See* Opp'n 21–24.  In one case, to be sure, the prosecutor took no notes during a meeting—but *did* ultimately disclose the exculpatory evidence to the defense, though perhaps too late.  *See* Reply Brief for Appellant at 5, *People v. Thomas*, 8 A.D.3d 303 (2d Dep't 2004) (No. 2002-09382).  There was no suggestion that the lack of written notes played any role in the prosecutor's delay in disclosing

the exculpatory evidence. *See generally Thomas*, 8 A.D.3d 303. And the other cases plaintiff cited in his complaint had nothing to do with the alleged no-notetaking policy. *See, e.g.*, *People v. Manzione*, 109 A.D.2d 755, 486 N.Y.S.2d 70 (2d Dep't 1985) (involving officers and a prosecutor who took notes but did not turn them over); *People v. Rivera*, 170 A.D.2d 544, 566 N.Y.S.2d 321 (2d Dep't 1991) (involving a police report); *People v. Baba-Ali*, 179 A.D.2d 725, 578 N.Y.S.2d 633 (2d Dep't 1992) (involving medical records); *People v. Clausell*, 182 A.D.2d 132, 587 N.Y.S.2d 672 (2d Dep't 1992) (involving a police report); *People v. Steadman*, 82 N.Y.2d 1, 623 N.E.2d 509 (2d Dep't 1993) (involving a third party's cooperation agreement); *People v. May*, 228 A.D.2d 523, 644 N.Y.S.2d 525 (2d Dep't 1996) (involving a third party's cooperation agreement); *Jenkins v. Artuz*, 294 F.3d 284, 287 (2d Cir. 2002) (involving a third party's cooperation agreement); *Turner v. Schriver*, 327 F. Supp. 2d 174, 184 (E.D.N.Y. 2004) (involving a witness's conviction record); *People v. Knight*, 18 Misc. 3d 1129(A), 856 N.Y.S.2d 501 (Sup. Ct. Queens Cnty. 2007) (involving police reports, video footage, and recorded witness statements); *People v. Bellamy*, 26 Misc. 3d 1210(A), 906 N.Y.S.2d 781 (Sup. Ct. Queens Cnty. 2010) (involving police reports); *People v. Robinson*, 34 Misc. 3d 1217(A), 950 N.Y.S.2d 493 (Crim. Ct. Queens Cnty. 2011) (involving a witness's contact information); *People v. Negron*, 26 N.Y.3d 262 (2d Dep't 2015) (involving evidence incriminating a third party).

In short, plaintiff's pleadings do not plausibly allege "a direct causal link" between the alleged no-notetaking policy and any *Brady* violations. *Brown*, 520 U.S. at 404; *see Sullivan v. City of New York*, No. 17-cv-3779 (KPF), 2018 WL 3368706, at *16 (S.D.N.Y. July 10, 2018) (*Monell* claim failed when plaintiff failed to "establish a clear causal connection between" between lawful stop-and-frisk policy and alleged constitutional violation). Accordingly, plaintiff fails to adequately plead a *Monell* claim under his no-notetaking theory.

11

### B.       Custom or Practice of Committing *Brady* Violations

Plaintiff does not adequately plead that his constitutional rights were violated as a result of a QCDAO custom or practice of failing to disclose exculpatory evidence in violation of *Brady*. Courts in this circuit recognize that a plaintiff may plead the existence of a *de facto* policy by citing "governmental reports" or court decisions if the reports or decisions describe cases that "involve factually similar misconduct, [are] contemporaneous to the misconduct at issue in the plaintiff's case, and result in an adjudication of liability." *Buari v. City of New York*, 530 F. Supp. 3d 356, 398–99 (S.D.N.Y. 2021) (citation omitted); *accord Rodriguez v. City of New York*, 607 F. Supp. 3d 285, 300 n.9 (E.D.N.Y. 2022); *see Nunez v. City of New York*, 735 F. App'x 756, 760 & n.2 (2d Cir. 2018) (summary order). The reports or decisions must reflect instances that are "so persistent or widespread as to constitute a custom or usage with the force of law." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (citation omitted); *see, e.g.*, *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–73 (2d Cir. 1992) (applying this framework). These requirements ensure that the practice plausibly "cause[d] *the plaintiff* to be subjected to . . . a denial of a constitutional right." *Torraco*, 615 F.3d at 140 (emphasis added).

Plaintiff falls short of pleading such a pattern. He principally relies on a "Prosecutorial Misconduct Survey" conducted in 1996, *see* Am. Compl. ¶¶ 155–63, and over 100 criminal appeals "[b]etween 1985 and [plaintiff's] trial in 2017" which reversed convictions in part due to "evidence of prosecutorial misconduct" by QCDAO, *id.* ¶ 144. Plaintiff also alleges that "[a]t one point" between 1991 and 2019, the district attorney told his top aide: "Jack, I think we've been getting away with this sort of thing for a long time." *Id.* ¶ 148. But the bulk of this evidence is temporally attenuated from the conduct of which plaintiff complains. Plaintiff's trial occurred at least a decade after 106 of the criminal cases he lists and more than two decades after the survey. *See* Am. Compl. at 55–72. As a result, those cases and the survey do not recount misconduct

12

"contemporaneous to the misconduct at issue" in plaintiff's case. *Buari*, 530 F. Supp. 3d at 399. When faced with similar temporal gaps, other courts in this circuit have dismissed *Monell* claims based on similar source materials. *See, e.g.*, *Breton v. City of New York*, 404 F. Supp. 3d 799, 817–18 (S.D.N.Y. 2019) (claim was insufficiently pleaded when the evidence was not "of relatively recent vintage" and plaintiff's case "occurred years later" (citation omitted)). While *Newson v. City of New York*, No. 16-cv-6773 (ILG) (JO), 2019 WL 3997466, at *8 (E.D.N.Y. Aug. 23, 2019), *see* Opp'n 14–15, on which plaintiff relies, takes a different approach—allowing a *Monell* claim to proceed based on the plaintiff's list of 87 cases involving prosecutorial misconduct that predated the plaintiff's conviction by over a decade—the weight of authority requires that alleged incidents underlying a *de facto* policy be at least somewhat contemporaneous to an underlying constitutional violation in order to make reasonable an inference that the incidents in question were the product of a common policy. *See, e.g.*, *Buari*, 530 F. Supp. 3d at 399, 406; *Breton*, 404 F. Supp. 3d at 817–18; *K.A. v. City of New York*, No. 16-cv-04936 (LTS) (JW), 2025 WL 2256891, at *4 (S.D.N.Y. Aug. 7, 2025); *Santiago v. City of Rome*, No. 24-cv-00704 (BKS) (MJK), 2025 WL 553347, at *9 (N.D.N.Y. Feb. 19, 2025); *A.P. v. Dannhauser*, No. 23-cv-6687 (PKC) (RML), 2025 WL 917233, at *7–8 (E.D.N.Y. Mar. 25, 2025). *Cf. Bell v. City of New York*, No. 22-cv-3251 (DG) (PK), 2023 WL 11916696, at *14 (E.D.N.Y. Sept. 1, 2023) (recommending denial of motion to dismiss when plaintiff provided "sufficiently contemporaneous" cases).

Moreover, of the seventeen cases plaintiff identifies in Exhibit A of his complaint that involved constitutional violations and were decided within a decade of his trial, just four involved *Brady* violations. *See* Am. Compl. at 72–74 (citing *People v. Knight*, 18 Misc. 3d 1129(A) (Sup. Ct. Queens Cnty. 2007); *People v. Bellamy*, 26 Misc. 3d 1210(A) (Sup. Ct. Queens Cnty. 2010); *People v. Robinson*, 34 Misc. 3d 1217(A) (Crim. Ct. Queens Cnty. 2011); *People v. Negron*, 26

13

N.Y.3d 262 (2015)); *id.* ¶¶ 168–74.  Of these, only one was in the five years before plaintiff's trial.  Elsewhere in the complaint, plaintiff also references *People v. Bell*, 71 Misc. 3d 646, 143 N.Y.S.3d 840 (N.Y. Sup. Ct. 2021), which involved a 1999 capital murder trial.  Without more, five cases involving *Brady* violations, just one of which occurred in the five years prior to plaintiff's trial, do not support a *Monell* custom-or-practice claim.  "Even drawing reasonable inferences in [plaintiff]'s favor, such a relatively small number of cases . . . in such a large municipality does not plausibly suggest that the alleged practice is 'so widespread as to have the force of law.'" *Buari*, 530 F. Supp. 3d at 406 (quoting *Brown*, 520 U.S. at 404); *see e.g.*, *Jones v. Town of E. Haven*, 691 F.3d 72, 85 (2d Cir. 2012) (concluding that "two instances, or at the most three, over a period of several years . . . fell far short of showing a policy, custom, or usage"); *Rodriguez*, 607 F. Supp. 3d at 299–300 & n.9 (similar).

Accordingly, plaintiff fails to adequately plead a *Monell* claim under this theory.

### C.    Failure to Train or Discipline

Plaintiff similarly fails to adequately plead a *Monell* claim based on the QCDAO's failing to train or discipline prosecutors regarding *Brady* violations.

*Failure to train.* The requirements for failure-to-train liability are stringent, because "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61; *see Reynolds v. Giuliani*, 506 F.3d 183, 191–92 (2d Cir. 2007).  To plead a *Monell* claim on a failure-to-train theory, a plaintiff must plausibly allege that the "failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Canton*, 489 U.S. at 388).  In addition, the plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Id.* at 196 (quotation marks and citation omitted).

14

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Brown*, 520 U.S. at 409).

Plaintiff fails to plausibly allege a failure to train that amounted to deliberate indifference. Plaintiff relies on the same prosecutorial survey and list of criminal cases addressed above, coupled with his allegation that the QCDAO leadership was aware of those incidents and did not take "any systemic action to address, prevent, or punish prosecutorial misconduct." Am. Compl. ¶ 149; *see id.* ¶¶ 143–66; Opp'n 13, 18–21. But plaintiff's failure-to-train theory is inadequate in that it relies generally on violations of *Brady* and fails to allege facts plausibly suggesting a deficiency in QCDAO's training "concern[ing] the nondisclosure of the same sort of evidence at issue in *this* case." *Greene v. City of New York*, 742 F. App'x 532, 536 (2d Cir. 2018) (summary order) (citing *Connick*, 563 U.S. at 62–63 (finding "four reversals" in ten years prior to the plaintiff's arrest did not give "notice that the [prosecutor's] office's *Brady* training was inadequate with respect to the sort of *Brady* violation at issue"); *Jones v. City of New York*, 988 F.Supp.2d 305, 313–14 (E.D.N.Y. 2013) (granting motion to dismiss where "impressive recitation of past *Brady* claims" did not include "the specific type of *Brady* material at issue")); *see also, e.g.*, *Harris v. City of Newburgh*, No. 16-cv-2731 (KMK), 2017 WL 4334141, at *6 (S.D.N.Y. Sept. 27, 2017) (collecting cases). Plaintiff has not pleaded any facts suggesting that the nature of the violations in the cases cited in the above survey and list were "similar" to the incidents plaintiff describes in his complaint. *Connick*, 563 U.S. at 62. And without a showing of similarity, plaintiff cannot allege a sufficient "pattern of injuries" to "establish municipal culpability and causation." *See Brown*, 520 U.S. at 409.

15

Even assuming the other *Brady* violations plaintiff cites were adequately similar, four *Brady* violations by the QCDAO in the ten years prior to plaintiff's trial does not plausibly suggest deliberate indifference, because that handful of violations does not suggest that the further similar misconduct was "'so likely to result' from [QCDAO]'s inaction as to render their inaction deliberately indifferent." *Astacio v. City of New York*, No. 23-7598, 2025 WL 80069, at *2 (2d Cir. Jan. 13, 2025) (summary order) (quoting *Reynolds*, 506 F.3d at 193); *compare Rodriguez*, 607 F. Supp. 3d at 299–300 (granting motion to dismiss claims against the QCDAO because just "three of the decisions the plaintiff cites" date to the years prior to his conviction), *and Breton*, 404 F. Supp. 3d at 818–19 (similar, fifteen complaints all at least six years prior), *with Buari*, 530 F. Supp. 3d at 406–07 (denying motion to dismiss claims citing "five vacated convictions in . . . the two years before [plaintiff's] prosecution, and several others before then"), *and Edwards v. City of New York*, 14-cv-10058, 2015 WL 5052637, at *6 n.3 (S.D.N.Y. Aug. 27, 2015) (same, eighteen lawsuits over twelve-year period).

*Failure to discipline.* Plaintiff's failure-to-discipline challenge fails for similar reasons. As with failure to train, a plaintiff advancing a failure-to-discipline theory must show that the City's approach to discipline reflected deliberate indifference—that is, that the need to act was "'so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need'" for supervision. *Hicks v. City of Syracuse*, 17-cv-0475, 2018 WL 6308653, at *5 (N.D.N.Y. Dec. 3, 2018) (quoting *Reynolds*, 506 F.3d at 192). "There are two ways to plausibly plead deliberate indifference with respect to failure to supervise/discipline. First, a plaintiff may plead (1) that there was a pattern of allegations of or complaints about similar unconstitutional activity and (2) that the municipality consistently failed to investigate those allegations. Second, a plaintiff

16

may plead (1) that there was a pattern of actual similar constitutional violations and (2) the municipality consistently failed to discipline those involved." *Tieman v. City of Newburgh*, 2015 WL 1379652, at *21 (S.D.N.Y. Mar. 26, 2015) (emphasis deleted); *accord Harris v. City of Newburgh*, 2017 WL 4334141, at *7 (S.D.N.Y. Sept. 27, 2017); *Pal v. Canepari*, 2023 WL 2712371, at *21 n.43 (D. Conn. Mar. 30, 2023), *aff'd*, 2024 WL 4341360 (2d Cir. Sept. 30, 2024). Plaintiff fails to adequately plead deliberate indifference under either theory because, as outlined above, he has not pleaded any facts that would allow a Court to determine whether the violations in the cases plaintiff cites in his pleadings are sufficiently "similar" to his own, *Tieman*, 2015 WL 1379652, at *21; *see Connick*, 563 U.S. at 62, and because four *Brady* violations in a decade in a busy municipality do not constitute the type of pattern that would support a deliberate indifference finding.

Because plaintiff has failed to adequately plead a viable theory of municipal liability, his *Monell* claim is dismissed.

## II.   Negligence

Plaintiff's negligence claim fails as a matter of law. Plaintiff alleges negligent hiring and supervision. *See* Am. Compl. ¶ 240; Opp'n 24. "A claim for negligent hiring or supervision can only proceed against an employer for an employee acting outside the scope of her employment." *Rodriguez v. City of New York*, 594 F. Supp. 3d 534, 548 (E.D.N.Y. 2022) (citation omitted); *see Velez v. City of New York*, 730 F.3d 128, 136–37 (2d Cir. 2013). The amended complaint nowhere alleges that any City employee ever acted outside his or her scope of employment; to the contrary, it affirmatively alleges that each individual defendant was "[a]t all times . . . acting within the scope of his employment." Am. Compl. ¶¶ 25–27; *accord id.* ¶ 28. Because plaintiff has "conceded that the defendants were acting within the scope of their employment," "judgment as a matter of law [is] warranted." *Velez*, 730 F.3d at 137; *see, e.g., Dawson v. City of Mount Vernon*,

17

No. 18-CV-1044 (JMF), 2023 WL 7219882, at *2 (S.D.N.Y. Nov. 2, 2023); *Hamilton v. City of New York*, No. 15-cv-4574 (CBA) (SJB), 2019 WL 1452013, at *31 (E.D.N.Y. Mar. 19, 2019); *Zanfardino v. City of New York*, 230 F. Supp. 3d 325, 336 (S.D.N.Y. Feb. 3, 2017). Accordingly, plaintiff's negligence claim is dismissed.

### CONCLUSION

The City's partial motion to dismiss is granted. Plaintiff's municipal liability claim under Section 1983 and negligence claim under state law are dismissed.

SO ORDERED.

 /s/  Rachel Kovner
RACHEL P. KOVNER
United States District Judge

Dated: March 11, 2026
       Brooklyn, New York